DELORES E. CURRY, Adm'r of the Estate of Elmer W. Curry, Deceased, Plaintiff-Appellant, v. JAY L. SUMMER, M.D., *et al.*, Defendants-Appellees.

Fourth District No. 4—84—0905

Opinion filed September 23, 1985.

Stephen O. Willoughby, of Willoughby & Latshaw, P.C., of Decatur, for appellant.

Jerald E. Jackson and William O. Martin, Jr., both of Samuels, Miller, Schroeder, Jackson & Sly, of Decatur, for appellee Gerald Snyder.

Richard F. Record, Jr., and Paul R. Lynch, both of Craig & Craig, of Mattoon, for appellees Jay L. Summer and Allen Bilyeu.

JUSTICE McCULLOUGH delivered the opinion of the court:

As administrator of the estate of Elmer Curry, Delores Curry brought this wrongful death action against the defendants, Jay Summer, Gerald Snyder, and Allen Bilyeu, for alleged medical malpractice. A jury returned a verdict in favor of all the defendants. The plaintiff appeals, contending: (1) The trial court erred in instructing the jury on proximate cause; (2) the trial court erred in refusing her instruction under section 323(a) of the Restatement of Torts (Restatement (Second) of Torts sec. 323(a) (1965)); (3) the trial court abused its discretion in allowing a nondisclosed witness to testify; (4) an improper closing argument by defendant Snyder requires reversal; and (5) the jury's verdict was against the manifest weight of the evidence.

On September 17, 1981, the decedent, Elmer Curry, complained of a cough and difficulty breathing. The Curry family contacted their doctor, Allen Bilyeu, a family practitioner. Bilyeu told them to bring the decedent to his office or to the emergency room. The family brought the decedent to St. Mary's Hospital at 10:50 p.m. Dr. Gerald Snyder was the physician on duty. A nurse took a brief history of the patient, which indicated that the decedent had diabetes. The decedent had a rapid pulse rate, a slight temperature, and an elevated respiration rate. Snyder ordered a chest X ray and a blood-sugar analysis. From the X ray Snyder diagnosed the decedent as having pneumonia. The next day, a radiologist interpreted the X rays as showing either pneumonia or pulmonary edema. Snyder never saw the radiologist's report. Snyder prescribed penicillin and sent the decedent home. The decedent coughed all night and could not lay down. The next day, the Curry family again called Bilyeu and was told to bring the decedent to the hospital. They did so at 9:17 p.m. The decedent's condition had not improved; rather, it had deteriorated. Snyder contacted Bilyeu to have the decedent admitted to the hospital. Snyder ordered another chest X ray and several routine admitting tests but did not order an electrocardiagram (EKG). After the decedent was admitted, Snyder ordered oxygen for him.

Bilyeu examined the decedent at 7 a.m. on September 19. He knew the decedent was a diabetic. He received the X rays, took a complete history and made a physical examination. The radiologist report stated the X rays probably represented pneumonia although pulmonary edema could not be ruled out. Bilyeu discovered no positive findings which would have indicated a cardiac problem. The patient did not complain of any chest pains. Bilyeu suspected the patient had pneumonia.

Bilyeu called in Dr. Jay Summer, a pulmonary specialist, as a con-

sultant. Summer examined the decedent between 11 and 11:30 a.m. Summer testified he suspected the patient had a history of cardiac problems, but he did not think the patient had an active problem because the patient showed no current symptoms. The patient denied waking up at night short of breath, a specific sign of heart failure. He was also coughing up "yellow thick blood streaked sputum" which was consistent with pneumonia. Summer found no physical signs consistent with congestive heart failure. The patient denied having any chest pains although he had a year's history of exertional chest pain. Summer concluded the patient had pneumonia rather than a cardiac problem. At 3 p.m., Summer ordered the concentration of oxygen that the patient was receiving be increased. Summer also ordered other treatment consistent with his diagnosis.

Later in the evening, nurses called Summer and told him that the patient was getting worse. Summer requested them to transfer the patient to intensive care. He also contacted Bilyeu. Summer arrived at the hospital as the patient was being transferred. Shortly after the patient arrived in the intensive care unit, he went into respiratory arrest. Summer tried to resuscitate the patient for 35 minutes. Bilyeu arrived, but the patient died at 9:08 p.m.

Snyder knew that diabetics could have silent or painless heart attacks. Snyder did not feel that he had deviated from the customary standard of care. He stated that if a physician suspected a cardiac problem, it would be a deviation from the normal standard of care not to order an EKG. Snyder, however, did not suspect a cardiac problem and, therefore, did not believe an EKG was necessary. He admitted the decedent's symptoms could be consistent with congestive heart failure. He had no opinion on whether the decedent would have survived if the heart condition had been correctly diagnosed.

Bilyeu also knew diabetics had a high risk of heart problems and silent heart attacks. He testified that if a cardiac problem is suspected, then an EKG is a standard test to be performed. An EKG is 80% accurate in revealing myocardial damage. Bilyeu testified the standard treatment for a cardiac problem had not been followed. He also testified the decedent's symptoms could be consistent with heart failure as well as pneumonia. He did not believe he deviated from the standard of care. He also believed that the patient's condition was nonsurvivable even if a correct diagnosis had been made because of the extent of damage to the heart. Summer had no opinion as to whether the attack would have been survivable with prompt diagnosis and correct treatment. He testified that he did not deviate from the normal standard of care.

Alan Fischer, a board certified family practitioner, testified as an expert witness for the plaintiff. He believed Snyder, Bilyeu, and Summer all deviated from the ordinary standard of care by not performing an EKG. Fischer believed that while some of the treatment ordered by Snyder was appropriate for a cardiac patient, other treatment could have been harmful. Fischer felt that the patient should have been given a higher concentration of oxygen immediately.

Pulmonary edema refers to fluid from blood vessels filling the lungs. Generally, it is a manifestation of pump failure. Fischer testified the underlying problem with the heart is severe but not necessarily fatal. Pump failure is caused by myocardial infarctions. A myocardial infarction is a death of heart muscle, which is then replaced by scar tissue. Fischer testified the cause of death was a cardiac arrythmia, an irregular heartbeat. He testified an arrythmia could be a separate problem from pump failure, but the decedent's arrythmia was consistent with pump failure. Fischer believed the patient had a very good chance of surviving if his condition had been correctly diagnosed and properly treated. While the patient could have survived for many years, Fischer conceded the patient may have died anyway. He declined to say whether it was probable or reasonably likely that the patient would have survived with proper treatment.

Grant Johnson, a pathologist, testified on behalf of Bilyeu and Summer. He reviewed the autopsy reports and tissue slides. He testified that death was due to a myocardial infarction. He observed infarcts of varying ages. The infarcts began 7 to 10 days before death. These infarcts were fairly extensive. Lesser areas of the heart showed infarcts some of which were between 12 and 24 hours old, and others 24 to 72 hours old. There was also a scar, indicating an infarction older than a month. Johnson had no opinion as to whether the patient's condition had become irreversible at any time prior to death.

Richard Herndon, a board certified specialist in internal medicine, also testified on behalf of Bilyeu and Summer. Herndon believed all three defendants deviated from the ordinary standard of care by not ordering an EKG. Herndon believed a correct diagnosis on September 17, however, would not have changed the outcome. Herndon testified the later infarcts were simply aftershocks of the original attack, which had occurred 7 to 10 days before death. He testified that while there are successful methods for treating arrythmias, there are no successful methods for treating pump failure caused by myocardial infarction. Over 80% of patients with pump failure die before they can be discharged from the hospital. Those who do not leave the hospital live less than one year, are physically handicapped, and are unable to

care for themselves. Herndon testified that none of the treatment given to the patient had an adverse effect and some of it would have been beneficial to a cardiac patient.

Bill Smiley, a retired emergency room physician, testified on behalf of Snyder. Smiley testified Snyder met the ordinary standard of care in diagnosing and treating the patient. Smiley did not believe the September 19 attack was survivable, but he did not think the damage was irreversible on September 18.

Howard Penning, a pathologist, did the autopsy on the decedent. He testified over the plaintiff's objection. Penning discovered a "massive" myocardial infarction. He estimated 50% to 75% of the heart had been damaged. He also found occlusions of both the right and left coronary arteries. He testified the cause of death was the massive myocardial infarction. Penning did not observe any pneumonia. The trial court did not allow Penning to testify on the issue of survivability.

After final argument, the court instructed the jury but failed to read the proximate cause instruction along with another instruction. The court recalled the jury and read these instructions. After deliberating, the jury returned a verdict in favor of all the defendants.

▮▮ The plaintiff first asserts the trial court erred in giving the defendant's instruction on proximate cause rather than hers. The plaintiff tendered the long version of Illinois Pattern Jury Instruction (IPI), Civil, No. 15.01 (2d ed. 1971):

> "When I use the expression 'proximate cause', I mean [any] cause which, in natural or probable sequence, produced the injury complained of. [It need not be the only cause, nor the last or nearest cause. It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury.]"

Instead, the court gave the short version of IPI Civil 2d No. 15.01 as tendered by the defendants:

> "When I use the expression 'proximate cause', I mean that cause which in natural or probable sequence, produced the injury complained of."

In refusing the long form, the court relied on *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301. In *Borowski*, the plaintiff was injured in an automobile accident. He sued the doctor and the hospital at which he was treated, alleging that their negligence caused the amputation of his leg. On appeal, the supreme court reversed a judgment in favor of the plaintiff and instructed the trial court to give the short form of IPI Civil 2d No. 15.01 in retrial. The court quoted

from the notes on use of the instruction:

" 'This instruction in its entirety should be used only when there is evidence of a concurring or contributing cause to the injury or death ***. In cases where there is no evidence of a concurring or contributing cause, the short version without the bracketed material should be used.' " (60 Ill. 2d 418, 431, 328 N.E.2d 301, 308.)

The court held the driver of the automobile, who injured the plaintiff, and the doctor, who subsequently aggravated the injury through malpractice, had not acted in concert and were not joint tortfeasors. Hence, use of the long form of IPI Civil 2d No. 15.01 was improper. Unlike *Borowski*, the three defendants in this case did allegedly act in concert. Plaintiff presented evidence to demonstrate that all three were possible contributing or concurring causes of the death.

The plaintiff argues the short form required her to prove each defendant's actions alone caused the injury. She notes the jury was instructed to consider the liability of each defendant separately. She contends she could not prove any defendant was the sole proximate cause when her evidence indicated the three doctors were concurring causes of the death. She maintains any error was highlighted because the court had to recall the jury to read the proximate cause instruction. We note the plaintiff never objected to this procedure.

The defendants contend the long version of IPI Civil 2d No. 15.01 is proper only when negligence of someone other than a party is a possible contributing cause. They rely on language to that effect from *Willson v. Pepich* (1983), 119 Ill. App. 3d 552, 456 N.E.2d 882, and *Bass v. Washington-Kinney Co.* (1983), 119 Ill. App. 3d 713, 457 N.E.2d 85. The defendants have simply taken that language out of context. Neither *Willson* nor *Bass* involved multiple defendants alleged to have acted in concert. Instead, they presented factual situations similar to *Borowski* where there was no possible contributing or concurring cause of the injury.

The plaintiff cites *Buehler v. Whalen* (1976), 41 Ill. App. 3d 446, 355 N.E.2d 99, and *Allen v. Pire* (1968), 102 Ill. App. 2d 421, 242 N.E.2d 450. In each case, a plaintiff sued two defendants, who allegedly concurred in causing the plaintiff's injuries. On appeal in each case, the defendants challenged the use of the long form of IPI Civil No. 15.01. Both courts noted the jury could have found the two defendants had concurred or contributed to cause the plaintiff's injuries. The courts concluded that the jury was not misled by the use of the full instruction. We agree with the plaintiff that under *Buehler* and *Allen*, the trial court would not have erred in the present case

had it given the long version. The issue in this case, however, is whether the trial court properly instructed the jury by use of the short form.

The test in determining the propriety of submitted instructions is whether, taken as a whole, they are sufficiently clear so as not to mislead the jury and whether they fairly and correctly state the law. (*Korpalski v. Lyman* (1983), 114 Ill. App. 3d 563, 449 N.E.2d 211.) The other instructions given in this case made it clear that there could be more than one proximate cause of the decedent's death and that the jury could find any or all of the defendants liable. The jury could not, as plaintiff contends, have concluded it had to find a single defendant was the sole proximate cause of the death. Although the long form may have been preferable, the trial court's instructions, as a whole, were proper. *Perry v. Chicago & North Western Transportation Co.* (1977), 54 Ill. App. 3d 82, 369 N.E.2d 155.

■■ ■ The elements necessary to establish a cause of action for medical malpractice are the same as any other negligence case. To prevail, the plaintiff must establish a duty owed to him by the defendant, a breach thereof proximately causing injury and resulting damage. (*Nichelson v. Curtis* (1983), 117 Ill. App. 3d 100, 452 N.E.2d 883.) To meet this burden of proof, the plaintiff must demonstrate that these propositions are more probably true than not true. *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 424, 328 N.E.2d 301, 305.

■ The plaintiff contends the jury may have concluded the defendants' negligence decreased the decedent's chance of survival, but even absent the defendants' negligence, the chance of survival was less than 50%. The plaintiff maintains she ought to be able to recover for the lost chance of survival even if that chance was less than 50%. Without showing that the decedent had a better than even chance of survival, the plaintiff could not prove the defendants' negligence more likely than not caused the decedent's death. Thus, the traditional burden of proof would preclude recovery in such a case. In an effort to change the burden of proof, the plaintiff tendered the following instruction, which the trial court refused:

"A person who undertakes to render services to another is liable for physical harm resulting from his failure to exercise reasonable care, if that failure increased the risk of harm."

Courts and other jurisdictions have struggled with the proper approach to take in so-called "lost chance of survival" cases. Some courts simply apply the traditional standards and require the plaintiff to prove that the defendant's negligence more likely than not caused

the death. (See, *e.g. Hanselmann v. McCardle* (1980), 275 S.C. 46, 267 S.E.2d 531; *Corfeldt v. Tongen* (Minn. 1980), 295 N.W.2d 638; *Cooper v. Sisters of Charity of Cincinnati, Inc.* (1971), 27 Ohio St. 2d 242, 272 N.E.2d 97.) The plaintiff cites numerous authorities which she asserts have rejected the traditional standards in "lost chance of survival" cases. A careful reading of each, however, reveals that none support the plaintiff's tendered instruction.

The instruction was based upon section 323(a) of the Restatement of Torts, which, according to the plaintiff, alters the usual burden of proof on proximate cause. Section 323(a) states:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm * * *." Restatement (Second) of Torts sec. 323(a) (1965).

We note this section does not even address proximate cause or the proper burden of proof. The Restatement addresses those standards in other sections. (Restatement (Second) of Torts secs. 431, 433B (1965).) Section 323(a) simply establishes a duty on one who undertakes to render services for the protection of another to use due care to avoid increasing the risk of harm. The question of duty was not really at issue in this case. A physician is always under a duty to use due care in the treatment of his patient. (*McMillen v. Carlinville Area Hospital* (1983), 114 Ill. App. 3d 732, 450 N.E.2d 5.) An instruction which merely emphasizes some abstract principle, sharply and unduly emphasizing some general right that is not directly in issue, is erroneous. *Meyer v. Williams* (1957), 15 Ill. App. 2d 513, 146 N.E.2d 712.

Section 323(a) does go on to provide liability for physical harm resulting from a breach of the duty, but it does not define what is meant by "resulting from." We believe section 323(a) contemplates the usual standards of proximate cause and burden of proof be applied under it. By not defining "resulting from," however, the plaintiff's instruction implies that the jury should find liability once the plaintiff proves the defendants increased the risk of harm which the decedent suffered. An instruction may not be given if it tends to mislead the jury even if it correctly states the law. (*Illinois State Trust Co. v. Walker Manufacturing Co.* (1979), 73 Ill. App. 3d 585, 392 N.E.2d 70.) The instruction would allow a full recovery for the decedent's death by showing any increase in the risk of harm, no matter

how slight. Such a result would completely eliminate the element of proximate cause.

An instruction identical to the one tendered in this case was tendered in *Jones v. Montefiore Hospital* (1981), 494 Pa. 410, 431 A.2d 920. Prior to *Jones*, the Pennsylvania Supreme Court decided section 323(a) relaxed the degree of certitude required of the plaintiff's expert medical testimony to make a case for the jury. (*Hamil v. Bashline* (1978), 481 Pa. 256, 392 A.2d 1280.) Normally, under Pennsylvania law, the plaintiff must show with a reasonable degree of medical certainty that a defendant-physician's conduct caused the injury. In cases where the doctor failed to properly diagnose and treat the patient, however, the *Hamil* court decided the jury rather than medical experts should balance the probabilities so that the doctor is not completely insulated from liability because of uncertainties created by his negligent conduct.

In *Jones*, the plaintiff sued the defendant for negligently failing to remove a tumor and perform post-operative tests. She alleged these failures caused her to contract cancer and shortened her life expectancy. The trial court refused the plaintiff's instruction under section 323(a). The Pennsylvania Supreme Court decided the trial court's instruction on proximate cause improperly required the jury to find that the defendants' negligence was the direct and only cause of the plaintiff's injuries and precluded the jury from deciding whether the defendants' conduct increased the risk of harm. The court, however, did not approve of the plaintiff's instruction. The court found it misleading because it instructed that once the jury found the defendants' conduct increased the risk of harm, liability had to follow. The court held that once the jury found an increase in the risk of harm, it had to go further and decide whether such increased risk was in turn a substantial factor in bringing about the resultant harm. (494 Pa. 410, 417 n.8, 431 A.2d 920, 924 n.8.) The plaintiff points to the "substantial factor" language, contending the court lowered the burden of proof. That language, however, is simply Pennsylvania's test for proximate cause. A defendant's negligence is not a substantial factor if the plaintiff's injury would have occurred in the absence of the negligence. Under the "substantial factor" test, the plaintiff still bears the burden of proof, which must be sustained by a preponderance of the evidence. (*Hamil v. Bashline* (1978), 481 Pa. 256, 265, 392 A.2d 1280, 1284.) The *Jones* decision simply required the jury be instructed on the traditional standards under an increased risk of harm theory.

The plaintiff next cites *Thompson v. Sun City Community Hospital, Inc.* (1984), 141 Ariz. 597, 688 P.2d 605, in which the evidence

demonstrated the defendant's negligence caused a delay in surgery that lessened the plaintiff's chance of a complete recovery. The Arizona Supreme Court decided the defendant was not entitled to a directed verdict even when the plaintiff failed to present evidence of the loss of a better than 50% chance of complete recovery. Relying on section 323(a) and the *Hamil* decision, the court held that even if the evidence permitted only a finding that the plaintiff was deprived of a significant chance of recovery, it should be left to the jury to decide whether the defendant's negligence was, in probability, a cause in fact of the plaintiff's injury. Without proof that the defendant's negligence more likely than not caused the plaintiff's injury, the jury would have to engage in speculation to decide the issue. The *Thompson* court acknowledged this but found it permissible because the defendant had created the uncertainty.

Similar cases cited by the plaintiff which allow the jury to decide the issue of proximate cause even without proof of a loss of greater than a 50% chance of survival or recovery include *Herskovits v. Group Health Cooperative* (1983), 99 Wash. 2d 609, 664 P.2d 474, *Kallenberg v. Beth Israel Hospital* (1974), 45 App. Div. 2d 177, 357 N.Y.S.2d 508, *aff'd* (1975), 37 N.Y.2d 719, 337 N.E.2d 128, and *Thomas v. Corso* (1972), 265 Md. 84, 288 A.2d 379. None of these cases indicate a plaintiff can recover even when the jury cannot conclude the patient would more likely than not have survived or recovered absent the defendant's negligence. Because the jury in the present case was allowed to decide the issue of proximate cause, these cases are inapposite. The *Thompson* decision itself is actually contrary to the plaintiff's argument. The *Thompson* court expressly stated the jury should not be instructed under section 323(a) because it was a rule for the trial court regarding the propriety of granting a directed verdict.

The plaintiff also cites *Hicks v. United States* (4th Cir. 1966), 368 F.2d 626, as a case in which the court lowered the burden of proof on causation. The *Hicks* court stated:

> "When a defendant's negligent action or inaction has effectively terminated a person's chance of survival, it does not lie in the defendant's mouth to raise conjectures as to the measure of the chances that he has put beyond the possibility of realization. If there was any substantial possibility of survival and the defendant has destroyed it, he is answerable." (368 F.2d 626, 632.)

We note the court discussed a "substantial possibility" of recovery, while the plaintiff's tendered instruction appears to impose liability

for the loss of any possibility of recovery. Moreover, in *Hicks*, the evidence indicated the decedent had a 75% chance of survival absent the defendant's negligence. Thus, recovery was permissible under the traditional standards.

The language quoted from *Hicks* has been rejected in Illinois. In *Wise v. St. Mary's Hospital* (1978), 64 Ill. App. 3d 587, 381 N.E.2d 809, the plaintiff urged the court to hold the defendant liable for destroying "any substantial possibility" of recovery. Relying on *Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301, the *Wise* court held a plaintiff in a malpractice case bears the burden of proving proximate cause by a preponderance of the evidence. In *Borowski*, the supreme court held a plaintiff need not show a better result would have been achieved absent the malpractice. The court stated the plaintiff must simply establish that the doctor's negligence more likely than not caused the injury. Both *Borowski* and *Wise* imply the usual burden of proof on causation should be applied in medical malpractice cases.

■■ ■ Besides not being supported by any authority, the plaintiff fails to raise the theory of her instruction in her complaint. She alleged the defendants' negligence caused the decedent's death. A plaintiff must recover on a case made by her complaint supported by evidence. She cannot state one cause of action in the complaint and make out a different one by her proof. (*Burroughs v. Mefford* (1944), 387 Ill. 461, 56 N.E.2d 845.) Proof without pleadings is as defective as pleadings without proof. (*Department of Transportation v. Rasmussen* (1982), 108 Ill. App. 3d 615, 439 N.E.2d 48.) The trial court properly instructed the jury on the basis of the plaintiff's complaint.

Pursuant to a pretrial order, the parties were to disclose expert witnesses by June 15, 1984. None of the parties named Penning, the pathologist who performed the autopsy. Snyder called Penning as the last witness in the case. The trial court allowed Penning to testify over the plaintiff's objection. The court decided Penning was an occurrence witness because he had performed the autopsy. The court refused to allow Penning to testify on any ultimate issue in the case. The plaintiff contends the trial court erred in not excluding Penning's entire testimony under Supreme Court Rule 219(c)(iv) (87 Ill. 2d R. 219(c)(iv)).

■■ The determination of the appropriate sanction for failure to comply with a discovery order lies within the discretion of the trial court. Each case presents a unique factual situation which must be considered in determining whether a sanction is to be imposed. Factors to be considered include any surprise to the adverse party, the

prejudicial effect of the testimony, the nature of the testimony, the diligence of the adverse party, and any lack of good faith. *Ashford v. Ziemann* (1984), 99 Ill. 2d 353, 459 N.E.2d 940.

 The plaintiff maintains she was surprised by Penning's testimony, but she knew prior to trial that Penning had performed the autopsy. She had an equal opportunity to discover what Penning knew. She also had a copy of his autopsy report from which he testified. The pretrial order was directed only at the disclosure of experts. An expert is one who is allowed to express an opinion based on certain facts when the proper conclusion to be drawn from those facts is beyond the ken of the average juror. Most of Penning's testimony dealt with his observations while performing the autopsy. The only opinions he expressed related to the cause of death and the age of the infarcts. Both of these opinions were contained in the autopsy report and had been the subject of testimony by numerous other witnesses. The plaintiff asserts Snyder acted in bad faith by failing to give her earlier notice that Penning would testify. Snyder contends Penning was out of the country and returned on the Friday before the Monday when he testified. The plaintiff notes she received no advance notice despite the fact that Penning testified pursuant to a subpoena and was the fourth witness of the day to testify. The trial court did offer to allow the plaintiff to take Penning's deposition, but the plaintiff declined. In addition, the defendants contend Penning's testimony became necessary due to the plaintiff's strategy in cross-examining their experts. The plaintiff cross-examined Herndon, Bilyeu, and Johnson extensively about the autopsy report, stressing the fact that they did not actually perform the autopsy or see the heart itself. The plaintiff also inquired about the size of infarcts mentioned in the report and the meaning of descriptive terms used such as "massive." While we do not approve of the complete lack of notice, we do not find that the trial court abused its discretion.

 The trial court overruled the plaintiff's objection to the following portion of the closing argument by Snyder's counsel:

> "I don't want to talk to just one or two of you. Because you, today, are making the decision for Macon County as to what happens in a case of this type. Your role is extremely important. It's extremely important, not only to my client, but to you and to our whole system."

A trial court has wide discretion on ruling on the propriety of closing arguments. (*Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.) The plaintiff contends the remarks suggest that Macon County and the jurors had a financial stake in the outcome of the litigation.

482

The plaintiff maintains the jurors could have concluded from these remarks that a finding of liability would increase their medical costs. We can find no such deep, hidden meaning in the remarks. The argument simply was not improper.

■■ ■ Finally, the plaintiff contends the jury's verdict was against the manifest weight of the evidence. She points out Herndon agreed with her expert that the three defendants deviated from the normal standard of practice. On the other hand, Herndon disagreed with the plaintiff's expert on the issue of survivability. Herndon testified the decedent would probably have died even if the normal standard of practice had been followed. Fischer testified the decedent had an excellent chance for survival, but he refused to say that the decedent probably would have survived. A verdict is contrary to the manifest weight of the evidence only if it is wholly unwarranted by the evidence or clearly the result of passion or prejudice. A jury's verdict is not contrary to the manifest weight of the evidence when the evidence is conflicting and the jury resolved the conflict. *Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.

For these reasons, the judgment of the trial court is affirmed.

Affirmed.

GREEN, P.J., and WEBBER, J., concurs.