*In re* ESTATE OF VELMA LEOTA CASEY, Deceased (Carol Lee Ivey, Ex'r of the Estate of Velma Leota Casey, Deceased, Petitioner-Appellee, v. JAMES E. PRICE *et al.*, Respondents-Appellants).

Fourth District No. 4—86—0323

Opinion filed May 11, 1987.—Rehearing denied June 4, 1987.

Barber, Segatto, Hoffee, Hines & Edwards, of Springfield (Barry O. Hines and R. Kurt Wilke, of counsel), for appellants.

Eliff, Keyser, Oberle & Davies, P.C., of Pekin (Timothy W. Kirk, of counsel), for appellee.

JUSTICE KNECHT delivered the opinion of the court:

The executor of the estate of Velma Leota Casey brought a citation proceeding to recover certain estate property which was in respondents' possession. The respondents claimed the property in question was theirs through an *inter vivos* gift from the decedent. A Sangamon County circuit court jury concluded that all property in question, excepting one automobile, belonged to the estate. The respondents appeal, claiming the jury was improperly instructed as to the burden of proof and the estate failed to set forth a *prima facie* case of ownership with regard to certain certificates of deposit.

The decedent died testate on December 27, 1983. Through decedent's will, her entire estate passed to her nephew, Carol Ivey. The will also named Mr. Ivey executor. Shortly after the decedent's death, the executor filed a citation petition seeking to recover assets of the estate from James Price, a nephew of decedent, and his wife, Doris.

The property at issue included certificates of deposit worth approximately $120,000. The certificates were held variously in the decedent's name, jointly between the decedent and her late husband, or in the late husband's name alone. Other property included a money market account, which had a balance of $14,332.36 shortly before the decedent's death, that had been drawn down to $87.33 at the time of the petition. The parties also contested ownership of savings bonds, the decedent's household furnishings and personal property, and the decedent's residence. Because we must examine the weight of the evidence to decide the issues before us, we will summarize the trial testimony.

At trial, Roger Bucher, assistant vice-president of the Illinois National Bank, identified the certificates of deposit as representing deposits at his institution. Bucher noted the certificates were held by the decedent, her late husband, or the two of them jointly and further testified his bank required a written request from the depositor to transfer any certificate of deposit. Bucher testified four of the certificates were "non-transferable," meaning they could not be transferred

without written assignment pursuant to Federal regulation. Bucher noted none of the certificates of deposit had been formally transferred from the decedent's and her late husband's names, but conceded he had no personal knowledge whether the testatrix might have given the certificates of deposit to another before her death.

Richard Chard, assistant cashier at Rochester [Illinois] State Bank, testified Mr. Price had redeemed $800 in savings bonds held jointly by the decedent and her late husband. Although each bond was endorsed with the decedent's signature, Chard stated it was his impression Mr. Price was redeeming the bonds for the decedent. Chard had no knowledge of what arrangement might have occurred between the respondents and the decedent outside his presence. Chard also testified that interest on the bonds was attributed to the decedent for tax purposes, but acknowledged this was a function of the name appearing on the bond.

Carol Ivey and his wife identified a list of household items as property they had personally observed in the decedent's home prior to her death. Jim Lesniak, a title insurance agent, testified that record title to the decedent's home was in her name alone. Lesniak stated the abstract of the title to the decedent's home, which was in respondent's possession, would be inadequate to convey title to the respondents.

Following the executor's case in chief, the respondents moved for a directed verdict, which the trial court denied. In rebuttal, the respondents presented a number of witnesses. Respondent James E. Price testified his aunt, the decedent, had remained in her own home following her husband's death in October 1983. Between October and December 12, 1983, when the decedent moved into the Price home, she ate poorly and was frequently provided food by the Prices. Mr. Price stated the decedent had broached the possibility of moving into the Prices' home, a move which took place on December 12, 1983. During this move, Mr. Price testified, the decedent gave the certificates of deposit to the Prices, indicating they might wish to hold on to the certificates until expiration to avoid an interest penalty. The decedent also indicated to the Prices they could do as they wished with her furniture and her house.

Mr. Price further testified he had spoken with Dennis Pierce of the Rochester State Bank to find out how to transfer the decedent's certificates of deposit into the respondents' names. Mr. Pierce indicated to respondent that the decedent's authorization was necessary, but the transfer could be accomplished between banks once the decedent's signature was obtained. Dennis Pierce testified he had con-

versed with Mr. Price in November 1983 concerning transfer of the certificates of deposit from the decedent's name into the Prices' names. Pierce stated it was his impression Mr. Price considered the certificates of deposit to be his own property.

Testifying about his contact with the decedent prior to her husband's death, Mr. Price stated he and his wife had occasionally visited the Caseys and had some telephone contact with them. However, Mr. Price admitted he had never visited his uncle during the latter's year-and-a-half struggle with terminal cancer. Mr. Price also conceded the decedent had not recognized him and his wife when they appeared at her husband's funeral and acknowledged the Prices had increased their contact with the decedent following her husband's death in October 1983. Mr. Price testified he believed his aunt was alert during December 1983, including the period when she had an attorney draft a new will.

Respondent Doris Price testified she saw the decedent much more frequently following the funeral in October 1983. Mrs. Price indicated she frequently brought meals to the decedent after October 15, 1983, as well as spending several hours in the decedent's home each night. Mrs. Price testified the decedent gave her three rolls of cash on December 5, 1983, along with her jewelry. The decedent endorsed the title of a red Pontiac to the Prices on December 9, 1983, adding $30 to pay for title transfer. On that date, Mrs. Price testified, the decedent added a $1,000 cash gift. On December 12, 1983, Mrs. Price testified, the decedent gave her the certificates of deposit, bonds, and title abstract, stating "[H]ere, honey, I want you and Jimmy to have these. There is $120,000 in C.D.'s, bonds, and the abstract and deed to my home." This gift took place as the respondents were moving the decedent into their home.

Larry Beck, Mrs. Price's brother, testified he had helped move the decedent into the Prices' home on December 12, 1983. Mr. Beck essentially corroborated his sister's version of the December 12, 1983, gift.

Attorney William Sheehan testified Mr. Price had contacted him in late 1983 to represent the decedent at a proceeding wherein Carol Ivey sought to have the circuit court appoint a guardian for the decedent and freeze her assets. Mr. Price later asked Sheehan to visit further with the decedent and represent her at subsequent hearings. Sheehan spoke with the decedent on December 19, 1983, and found her alert. Sheehan was informed the decedent wished to change her will. When Sheehan visited the decedent in the hospital two days later, she instructed him to prepare a new will. Sheehan returned

with the newly drafted will on December 22, 1983, but did not have the decedent execute the document because she appeared to him groggy and incompetent. Although the new will would have substituted the Prices for Carol Ivey as sole beneficiaries, Sheehan stated these changes did not appear to have been suggested by the Prices. He noted the decedent and the Prices seemed affectionate toward each other. During these visits, Sheehan testified, the Prices never indicated to him that the decedent had given them her property, while the decedent told him only that she had given one car to Carol Ivey and one car to the Prices.

Dr. Robert Bussing testified he had examined the decedent on December 21, 1983. At that time, the doctor had discovered an advanced cancerous growth on decedent's neck. Dr. Bussing stated he had discovered an elevated calcium level in the decedent during his examination and believed this condition could cause mental changes ranging from sleeplessness to hallucination. As a result of his examination, Dr. Bussing prescribed morphine for the decedent. Although the doctor found the decedent alert, he did not do a full mental examination.

Katherine Hugo, a paramedic, testified she had met the decedent during the latter's December 20, 1983, ambulance trip to the hospital. Ms. Hugo stated the decedent appeared oriented and seemed fond of the people with whom she was staying.

Marian Daugherty was a nurse on duty December 21, 1983, when the decedent was admitted to the hospital. Ms. Daugherty indicated she had known the decedent prior to the latter's hospitalization, but the two had not had contact for several years prior to the night about which she testified. According to Ms. Daugherty, the decedent appeared fully oriented throughout the evening. The decedent spoke to the nurse of living with the Prices and stated her plan to sell her home and live on the proceeds. The decedent indicated to Ms. Daugherty she had given one automobile to each of her nephews. During their conversation, the decedent told Daugherty Carol Ivey was her beneficiary, but indicated she intended to change her will. Ms. Daugherty believed this change was something intended to occur in the future.

Maeleen Richardson, Carol Ivey's stepdaughter, and Mae Ivey, Carol's wife, both recounted an incident occurring at the funeral for decedent's husband. At that event, in October 1983, the decedent did not recognize the Prices when she met them at the funeral. Mrs. Ivey also testified she and her husband visited the decedent on weekends subsequent to the funeral. The Iveys would frequently take the decedent to a fast food restaurant to eat, and Mrs. Ivey recalled the dece-

dent would not order cheese on her hamburger because of the additional 10-cent charge. Mrs. Ivey testified to numerous phone calls between the Iveys and the decedent following the death of decedent's husband. According to Mrs. Ivey, the decedent never mentioned being visited by the Prices.

Velinda Hurley, the decedent's next-door neighbor, testified she first noticed the Prices visiting the decedent three to four weeks before the latter's death. Mrs. Hurley stated she had a dog who barked to strangers, so she was sure that the decedent had few visitors. Mrs. Hurley acknowledged, however, that her work schedule would have precluded her being home during the early morning hours when Mr. Price had testified he was most likely to visit.

Finally, Gladys Price, Mr. Price's mother, testified the decedent had told her she intended to change her will to leave everything to the Prices. The elder Mrs. Price also testified the decedent had told her prior to her death that she had given everything to the Prices.

At the jury instruction conference, the respondents submitted instruction No. 4, which stated:

"When I say that the Respondents James and Doris Price have the burden of proof on any proposition, or use the expression 'if you find', or 'if you decide', I mean you must be persuaded, considering all the evidence in the case, that the proposition on which they have the Burden of Proof has been proven by clear and convincing evidence."

The court refused this instruction. Instead, the court adopted petitioner's instruction, which stated in relevant part:

"[W]hen I say that the Respondents have the burden of proving a valid gift to them by the decedent, or use the expression 'if you find' or 'if you decide', I mean you must be persuaded, considering all the evidence in the case, that the proof of the valid gift must be clear and convincing evidence which is the amount of proof which leaves no reasonable doubt in the mind in [sic] the trier of fact."

The jury ultimately decided the decedent had given only a 1977 Pontiac automobile to the respondents.

On appeal, respondents argue a new trial is necessary because the trial court erroneously instructed the jury as to the meaning of "clear and convincing" evidence. Alternatively, respondents contend the petitioner failed to present a *prima facie* case of ownership with regard to the certificates of deposit.

 To recover property in a citation proceeding (Ill. Rev. Stat. 1983, ch. 110½, par. 16—1 *et seq.*), an executor must initially establish

a *prima facie* case that the property at issue belongs to the decedent's estate. The burden then shifts to the respondent to prove his or her right to possession by clear and convincing evidence. (*In re Estate of Shanahan* (1978), 59 Ill. App. 3d 269, 375 N.E.2d 508.) Clear and convincing evidence falls midway on the spectrum of degrees of proof, between the normal civil burden of "preponderance" and the criminal burden of "beyond a reasonable doubt." (*In re Stephenson* (1977), 67 Ill. 2d 544, 367 N.E.2d 1273; *In re Estate of Ragen* (1979), 79 Ill. App. 3d 8, 398 N.E.2d 198.) Despite this clear distinction among the different degrees of proof, clear and convincing evidence has most often been defined as "the quantum of proof which leaves no reasonable doubt in the mind of the trier of fact as to the truth of the proposition in question (*Galapeaux v. Orviller* (1954), 4 Ill. 2d 442, 123 N.E.2d 321; *Morelli v. Battelli* [(1979), 68 Ill. App. 3d 410, 386 N.E.2d 328])." *In re Estate of Ragen* (1979), 79 Ill. App. 3d 8, 14, 398 N.E.2d 198, 203.

Although many Illinois courts, including this court (*e.g., In re Estate of Hutchins* (1984), 120 Ill. App. 3d 1084, 458 N.E.2d 1356), have defined "clear and convincing evidence" in terms of reasonable doubt, we are not aware of any case which has offered this definition of clear and convincing evidence in the context of instructing a jury. Moreover, Illinois has no pattern instruction which defines clear and convincing evidence. This court has recently stated that the propriety of jury instructions depends upon "whether, taken as a whole, they are sufficiently clear so as not to mislead the jury." Jury instructions must also "fairly and correctly state the law." (*Curry v. Summer* (1985), 136 Ill. App. 3d 468, 476, 483 N.E.2d 711, 716.) If instructions correctly state the law, yet would mislead the jury, they must not be given. *Curry v. Summer* (1985), 136 Ill. App. 3d 468, 483 N.E.2d 711; *Illinois State Trust Co. v. Walker Manufacturing Co.* (1979), 73 Ill. App. 3d 585, 392 N.E.2d 70.

Applying these general principles to the present case, we conclude the trial court erred in instructing the jury that "clear and convincing evidence" was the quantum of proof "which leaves no reasonable doubt in the mind [of] the trier of fact." Rather than applying the lesser standard of proof intended by the term "clear and convincing evidence," jurors applying this instruction are likely to be misled and erroneously apply the burden of proof applicable to a criminal case. Some members of a jury may, as a practical matter, be familiar with the criminal burden of proof due to prior jury service. (See *Rikard v. Dover Elevator Co.* (1984), 126 Ill. App. 3d 438, 467 N.E.2d 386.) This fact increases the possibility of misleading jurors as to the

quantum of proof respondents must produce. Like its criminal law counterpart "beyond a reasonable doubt," perhaps the term "clear and convincing evidence" is best left undefined. (See Illinois Pattern Jury Instructions, Criminal, No. 2.05 (2d ed. 1981).) If the term "clear and convincing evidence" is to be defined, then the definition should be one which will aid jurors and clearly distinguish it from the other degrees of proof.

Although the trial court erred in defining "clear and convincing evidence" for the jury, this error was harmless. The evidence on the claim of an *inter vivos* gift from the decedent was not close, and the jury was not misled. The respondents and their relatives testified decedent had given all her property to the Prices prior to her death. However, Illinois courts have frequently stated they will lend a very unwilling ear to statements by interested persons about what dead people have said. *E.g., In re Estate of Hackenbroch* (1962), 35 Ill. App. 2d 155, 182 N.E.2d 375.

Contradicting the interested testimony which supported an inference of gift, Nurse Daugherty and attorney Sheehan, both disinterested, testified the still-lucid decedent spoke to them about her plan to change her will to benefit respondents. It is also uncontradicted that decedent indicated to Nurse Daugherty she intended to sell her home and live on the proceeds, even though she was living with the Prices. All witnesses appeared to agree that the decedent was in control of her faculties until she began receiving morphine injections a few days prior to her death. The evidence is also clear that decedent was able to properly endorse documents when she intended to make a gift of property, as she did with the title of her 1977 Pontiac. All indications from disinterested witnesses were that decedent considered her property to still be her own, even though she apparently intended to change her will to benefit the Prices. Common experience suggests it is implausible that a woman of modest means, who had accumulated a good deal of money and other property through a lifetime of thrift, would suddenly shower her nephew and his wife with large amounts of cash, jewelry, and most of her other tangible assets. Respondents' evidence did not dispel the unlikelihood of this story. We see no reason to upset the jury's verdict against the respondents.

We must also reject respondents' claim that petitioner failed to present a *prima facie* case that the estate owned the certificates of deposit. A certificate of deposit is presumed to belong to the person whose name appears on the certificate. (*Multi-Clean Products, Inc. v. Kasper* (1971), 3 Ill. App. 3d 12, 279 N.E.2d 111.) Although a party might attempt to show ownership other than through evidence of the

name appearing on a document, we believe that proof a certificate of deposit bore the name of the decedent as an owner, combined with the fact that the certificate was not endorsed, presented a *prima facie* case of ownership by the estate. See *In re Estate of Hackenbroch* (1962), 35 Ill. App. 2d 155, 182 N.E.2d 375.

The respondents' reliance on *In re Estate of Hill* (1961), 30 Ill. App. 2d 243, 174 N.E.2d 233, is misplaced. In *Hill*, an executor sought to recover certain corporate stock which was in the possession of decedent's widow. The executor presented evidence that the stock certificate was issued in the name of the decedent and had remained in that name on the books of the corporation. The trial court refused to hear the widow's testimony, finding her incompetent to testify, and entered a finding for the executor. The appellate court concluded the trial court had improperly refused to allow the widow to testify in her own behalf. Accordingly, the case was remanded for a new trial. Although some language in *Hill* might suggest a *prima facie* case of ownership was not proved by showing the book owner of a security had failed to endorse it, these statements are *dicta*. Moreover, the court's statements in *Hill* relied to some extent upon interpretation of a statute which has since been repealed. (Ill. Rev. Stat. 1959, ch. 32, par. 436.) In our view, the better-reasoned cases permit *prima facie* ownership of a certificate of deposit to be proved by showing the named owner has not endorsed the certificate. (*Multi-Clean Products, Inc. v. Kasper* (1971), 3 Ill. App. 3d 12, 279 N.E.2d 111; *In re Estate of Hackenbroch* (1962), 35 Ill. App. 2d 155, 182 N.E.2d 375.) To the extent *Hill* is inconsistent with this view, we decline to follow that case.

Although the circuit court erred in defining "clear and convincing evidence" for the jury, this error was harmless. Likewise, the executor presented a *prima facie* case of ownership by presenting evidence that neither the decedent nor her husband had endorsed the certificates of deposit to the respondents. For these reasons we affirm the judgment of the circuit court of Sangamon County.

Affirmed.

GREEN and LUND, JJ., concur.