11 June 1999

NO. 4-98-0746

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

LUCIE LAMBIE, Mother and Next Friend ) Appeal from

of CHELSEY LAMBIE, a Minor, ) Circuit Court of

Plaintiff-Appellant, ) Sangamon County

v. ) No. 93L597

JOEL SCHNEIDER, M.D., )

Defendant-Appellee. ) Honorable

) Jeanne E. Scott,

) Judge Presiding.

_________________________________________________________________

JUSTICE McCULLOUGH delivered the opinion of the court:

On March 7, 1987, Chelsey Lambie was born six weeks premature.  On March 19, 1987, after Chelsey started to suffer left congestive heart failure, defendant, Dr. Joel Schneider, operated on her to repair a patent ductus arteriosus (PDA), an abnormal opening connecting the heart to one of the blood vessels leaving it.  When Schneider could not locate the PDA, he placed Gore-Tex bands around the vessels leaving Chelsey's heart to decrease the abnormally high flow of blood from Chelsey's heart to her lungs.  On December 6, 1993, plaintiff Lucie Lambie, mother and next friend of Chelsey, brought a medical malpractice action against defendant.  On May 5, 1998, a jury returned a verdict in favor of defendant.  Plaintiff appeals, arguing the trial court erred by not giving her tendered instruction on "increased risk of harm," by refusing to instruct the jury so as to correct a misstatement of the evidence by defense counsel in opening and closing argument, and by refusing to excuse one juror for cause.  We affirm.

When Chelsey was born, she was in respiratory distress and immediately came under the care of Dr. Carlos Chua, a neonatologist at the High Risk Center at St. John's Hospital in Springfield, Illinois (St. John's).  Within days of her birth, Chelsey developed a heart murmur and Dr. Patricia VonBehren, a pediatric cardiologist, was consulted.  VonBehren concluded Chelsey had a PDA.  Both VonBehren and Chua diagnosed Chelsey as also having congestive heart failure.

After attempts to close the PDA with drugs failed, VonBehren recommended that Chelsey undergo surgery to close it.  On March 19, 1987, defendant performed surgery on Chelsey to ligate the PDA.  During the surgery, defendant could not find a PDA and chose to cut further into Chelsey's chest cavity to diagnose her problem.  Defendant concluded Chelsey had a truncus arteriosus, a condition where the blood vessel carrying blood to the body merges with the blood vessel carrying blood to the lungs.  

Defendant testified he chose to place a band on each of Chelsey's two pulmonary arteries.  Dr. Arnold Strauss, the pediatric cardiologist under whose care Chelsey came when she was subsequently transported to St. Louis, testified that banding had been used where there was some abnormal shunt.  It constricts the flow of blood to the lungs until such time as a problem can be repaired.  VonBehren testified she was consulted during the surgery.  She understood the bands to be a temporary measure, to slow down the shunt for "a short period of time."  Dr. David Ott, a pediatric cardiovascular surgeon, and Dr. Thomas Spray, a cardiac surgeon at Children's Hospital in St. Louis (Children's), testified the bands were a temporary, palliative maneuver, to be used until the problem could be diagnosed and fixed.  The parties presented conflicting opinions from these and other medical experts as to whether defendant was negligent in prolonging the surgery and cutting deeper into Chelsey in order to attempt a diagnosis and place the bands.  After surgery, defendant consult­

ed with all of Chelsey's treating physicians and concluded further diagnostic tests needed to be performed.  

According to Dr. Kenneth Barron, a cardiovascular surgeon called by plaintiff, Chelsey was then taken to Children's for more tests.  According to VonBehren, defendant did not know of the transfer until the day it occurred.  According to Dr. Kenneth Barron, a cardiovascular surgeon called by plaintiff, Chelsey's condition worsened after the surgery and before she got to St. Louis.  Strauss described Chelsey as critically ill when she arrived in St. Louis.  Chelsey could not breathe on her own and required a ventilator.  Her pulmonary and tricuspid heart valves were leaking.  

Chelsey now had a severe right heart failure, whereas she was only having mild left heart failure before the surgery.    Barron testified the bands caused Chelsey's right heart failure.  Dr. Anne Wedemeyer, a pediatric cardiologist called by plaintiff, agreed.  She testified that if defendant had just backed out of the operation when he could not find the PDA, Chelsey's left heart failure would have continued, but there would have been no right heart failure.  

At Children's, a heart catheterization diagnosed Chelsey's condition as either a very abnormal PDA or an aorticopulmonary (AP) window.  On March 20, 1987, Spray performed surgery to correct the abnormal PDA or AP window, and to remove the bands.  Spray testified he did not remember exactly how long the bands were on, but as far as he could recall, they were on a few days.  Spray testified the bands were not too tight.  His notes made no mention of injury due to the bands.  However, Spray testified he did not want the bands on any longer than they were on.  He testified the tricuspid and pulmonary valves were leak­

ing, but that some loss of valvular competence was normal for this situation.

Chelsey also had damage to her phrenic nerve.  Strauss, Wedemeyer, and Barron testified defendant's additional dissection during the March 19, 1987, surgery increased the risk of phrenic nerve damage.  Spray testified phrenic nerve damage was a well-

known surgical complication that often occurred without negli­

gence.  All agreed the Springfield operation, not the later operation in St. Louis, was the likely cause of the damage. 

According to Wedemeyer, damage to the phrenic nerve can cause paralysis of the left diaphragm.  When Chelsey's diaphragm was paralyzed, it moved upward into her chest cavity, preventing her lung from expanding properly.  According to Strauss, a paralyzed diaphragm almost always requires a breathing machine, which increases the risk of infection.  According to Wedemeyer, Chelsey could not be weaned off of the respirator, causing repeated respiratory infections and pneumonia.  Additionally, the displaced lung caused Chelsey's esophagus and stomach to be distorted to the point that she had difficulty keeping food down.  Ultimately, Chelsey had surgery in St. Louis to correct her paralyzed diaphragm.

As Chelsey got older, it became apparent that she suffered hearing loss in both ears.  The parties presented conflicting testimony from medical experts on whether Chelsey's hearing loss was caused by medicines, including gentamicin, an antibiotic that can harm the inner ear.  Gentamicin was not required by the March 19, 1987, surgery, but by complications arising after that surgery.

On December 6, 1993, plaintiff filed suit, alleging defendant's negligence proximately caused Chelsey to suffer unnecessary pain and to remain greatly disordered and weakened.  The trial began with jury selection on April 27, 1998.  Plaintiff used a peremptory strike on the morning of April 28, 1998, to excuse the first alternate juror, whose brother's open heart surgery had been performed by defendant.  This alternate juror was not replaced.  Defendant informed the court he would not accept a verdict by less than 12 jurors.

On April 29, 1998, juror Ronald Howell met in chambers with the parties' counsel and the trial judge.  Howell stated that defendant had performed open heart surgery on his father-in-

law 17 years earlier.  Howell stated his father-in-law was again having heart problems and that he learned the night before that if his father-in-law has surgery again, defendant had been selected to perform it.  In response to the trial judge's ques­

tions, Howell stated he believed he could still decide the case on its merits without feeling any bias one way or the other about the doctor.  Neither counsel asked Howell any questions to determine the nature of his father-in-law's problems or the nature of his relationship with his father-in-law.

The trial judge allowed Howell to remain on the jury, provided that, if the father-in-law did, in fact, receive surgery from defendant during the trial, the juror was to inform the court.  The trial went forward, and the above medical expert testimony was heard.  On May 5, 1998, the jury returned a verdict in favor of defendant.

Plaintiff first argues the trial court erred by failing to give her tendered jury instruction on increased risk of harm.  Proximate cause has two components:  (1) cause in fact and (2) legal cause.  Legal cause is a policy decision that limits how far a defendant's legal responsibility can be extended for conduct that did, in fact, cause plaintiff harm.  Cause in fact is established when a reasonable degree of certainty exists that defendant's conduct did, in fact, cause plaintiff's injury.  
Lee v. Chicago Transit Authority
, 152 Ill. 2d 432, 455, 605 N.E.2d 493, 502 (1992); 
Yager v. Illinois Bell Telephone Co.
, 281 Ill. App. 3d 903, 909, 667 N.E.2d 1088, 1093 (1996).  Cause in fact becomes impos­sible to prove if a plaintiff suffers injury after he receives medical treatment when he has less than a 50% chance of recovery or survival.  

To cure this problem in proving cause in fact, the supreme court adopted the "lost chance" doctrine in 
Holton v. Memorial Hospital
, 176 Ill. 2d 95, 111, 679 N.E.2d 1202, 1209 (1997).  The supreme court held that a plaintiff may recov­er, even if he has less than a 50% chance of survival or recov­ery, when malpractice deprives him of a chance to survive or recover from a health problem, lessens the effectiveness of treatment, or increases the risk of an unfavorable outcome.  
Holton
, 176 Ill. 2d at 111, 119, 679 N.E.2d at 1209, 1213.  
To recover, the plain­

tiff must only show with a reasonable degree of medical certainty that the malpractice lessened the effectiveness of the treatment to plaintiff.  See 
Holton
, 176 Ill. 2d at 117-18, 679 N.E.2d at 1212.  

Plaintiff argues she was entitled to a "lost chance" instruction here.  She argues the trial court erred by rejecting her tendered instruction No. 17, which read:

"A physician who undertakes to render medical services to a patient which he should recog­

nize as necessary for the protection of the patient is subject to liability to the pa­

tient for physical harm resulting from this failure to exercise rea­sonable care to per­

form his medical services, if his failure to exercise such care increases the risk of harm to the patient."

This instruction is not found in the Illinois Pattern Jury Instructions, Civil (3d ed. 1995) (hereinafter IPI Civil 3d).  It is based on section 323(a) of the Restatement (Second) of Torts, which states, in pertinent part:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm ***."  Re­

statement (Second) of Torts §323(a), at 135 (1965) (hereinafter Restatement). 

Plaintiff argues adding the bands increased the risk of phrenic nerve injury by increasing the duration and scope of the March 19, 1987, surgery.  

The court rejected plaintiff's instruction for two reasons.  First, it believed the tendered instruction would cause unnecessary confusion.  Second, it believed the other instruc­

tions adequately instructed the jury on the issue of proximate cause.  

Every litigant is entitled to have the jury instructed as to the law governing the case, but departure from approved pattern instructions requires careful scrutiny since nonpattern in­structions should be used cautiously and only when necessary to provide a fair trial.  
Even if an instruction correctly states the law, it must be sufficiently clear so as not to confuse or mislead the jury and must not unduly emphasize any part of the matter.  If the jury instructions fairly and accurately state the law, reversal is not required even though the jury may have been instructed in an alternative manner that would have been equally acceptable.  
Henry v. McKechnie
, 298 Ill. App. 3d 268, 277, 698 N.E.2d 696, 701 (1998).

Plaintiff notes the following language from this district's decision in 
Henry
:

"In cases discussing jury instructions on the lost chance doctrine, the courts have vari­

ously required a finding of probability of causation, a finding of substantial possibil­

ity of a better result, 
language
 
based
 
on
 
section
 
323
 
of
 
the
 
Restatement
 
of
 
Torts
, or modifying the substantial factor formula for causation."  (Emphasis added.)  
Henry
, 298 Ill. App. 3d at 276, 698 N.E.2d at 701, cit­

ing Annot., J. Hodson, 
Medical Malprac­tice:  "Loss of Chance" Causality
, 54 A.L.R. 4th 10, 79-84 (1987 & Supp. 1997). 

Plaintiff argues that because his tendered instruction was based on section 323 of the Restatement, it should have been allowed.

Plaintiff misreads 
Henry
.  The above language was based on a section of the Hodson article that summarized other juris

dictions' approaches to jury instructions on the "lost chance" doctrine.  The quoted language was intended as a summary of other states' approaches to this issue, not as a statement of Illinois law.

In fact, 
Henry
 rejected instructions based on section 323(a) of the Restatement.  Prior to 
Holton
, in 
Curry v. Summer
, 136 Ill. App. 3d 468, 483 N.E.2d 711 (1985), this district affirmed a trial court's denial of an instruction based on section 323(a).  
Curry
 reasoned that section 323(a) contemplates that the normal proximate cause analysis will still be applied to determine if a defendant is liable.  However, if used as an instruction, the "resulting from" language of section 323(a) could be misinterpreted to mean that a defendant is liable whenever he increases the risk of harm to defendant.  
Curry
, 136 Ill. App. 3d at 477-78, 483 N.E.2d at 717-18.  
Curry
 also ques­

tioned the "lost chance" theory in general.  
Curry
, 136 Ill. App. 3d at 478-79, 483 N.E.2d at 718-19.  

Holton
 overruled the part of 
Curry
 questioning the "lost chance" theory.  
However, the 
Holton
 opinion noted that this was 
dicta
 in 
Curry
 (
Holton
, 176 Ill. 2d at 112, 679 N.E.2d at 1209), and did not reach the issue of whether 
Curry
 cor­rectly rejected instructions based on section 323(a) of the Restatement.  
In 
Henry
, decided after 
Holton
, this district reaffirmed 
Curry
 and again rejected a jury instruction based on section 323(a) of the Restatement, allowing recovery for an increased risk of harm "resulting from" the defendant's conduct.  
Henry
, 298 Ill. App. 3d at 277, 698 N.E.2d at 701-02.

While the "lost chance" doctrine eliminates a problem of demonstrating "cause in fact," it does not eliminate the requirement that
 the plaintiff prove defendant's conduct was the legal cause of his injury.  
Cf
. 
Holton
, 176 Ill. 2d at 120, 679 N.E.2d at 1213 ("We hold that the loss of chance concept, when properly analyzed, does not relax or lower plaintiffs' burden of proving causation").  A malpractice defendant cannot be held liable if the injury could not have been foreseen or reasonably anticipated as the probable result of an act of negligence.  See 
Nichelson v. Curtis
, 117 Ill. App. 3d 100, 105, 452 N.E.2d 883, 886 (1983).  

Therefore, even if the "lost chance" doctrine is accepted, the language of section 323(a) of the Restatement is still misleading in that it indicates a defendant may be found liable for any increased risk "resulting from" his conduct, regardless of whether that increased risk is foreseeable.  While plaintiff attempts to distinguish the instruction tendered here from the instruction at issue in 
Henry
, both instructions contain this language.  The instructions tendered here also require the jury to define for itself what "subject to liability" means.  This absolute language also suggests the jury could find defen­

dant liable without finding his conduct was the legal cause of plaintiff's injury.

Plaintiff argues 
Henry
 is distinguishable from this case because the 
Henry
 opinion noted that no one argued the IPI Civil 3d instructions actually given did not accurately state the law (
Henry
, 298 Ill. App. 3d at 277, 698 N.E.2d at 701).  Plain­

tiff makes such an argument here.  The jury here was given the "long form" proximate cause instruction in IPI Civil 3d No. 15.01.  In 
Hajian v. Holy Family Hospital
, 273 Ill. App. 3d 932, 941, 652 N.E.2d 1132, 1139 (1995), the court held that the "short form" IPI Civil 3d proximate cause instruction adequately in­

formed the jury of the applicable law.  See also 
Curry
, 136 Ill. App. 3d at 475-76, 483 N.E.2d at 716-17.  
Hajian
 concluded that, while an instruc­tion that properly sets out the "lost chance" rule may be appropri­ate, where no such instruction is submitted without technical defects, the IPI Civil 3d proximate cause in­struc­tion is ade­quate.  
Hajian
, 273 Ill. App. 3d at 941, 652 N.E.2d at 1139.  Though 
Holton
 did not address this issue direct­

ly, 
Hajian
 was cited with approval in the 
Holton
 decision.  
Holton
, 176 Ill. 2d at 118, 679 N.E.2d at 1212.  While the "short form" proximate cause instruc­tion was given in 
Hajian
 and 
Curry
, 
Curry
 suggested the "long form" instruction given here is actual­

ly preferable for a "lost chance" case.  
Curry
, 136 Ill. App. 3d at 475-76, 483 N.E.2d at 716-17.

Plaintiff next argues defense counsel should not have been allowed to argue in its opening and closing statements that defendant intended to remove the bands within a couple days.  In opening argument, counsel is given wide latitude, but he may not make remarks that he does not intend to prove or cannot prove.  
Augenstein v. Pulley
, 191 Ill. App. 3d 664, 670, 547 N.E.2d 1345, 1349 (1989).  In closing argument, counsel may make a fair comment upon the evidence, present the evidence in the light most favorable to his case, and draw inferences from the evidence.  However, he may not misrepresent the evidence or argue facts not in evidence.  
Schwedler v. Galvan
, 46 Ill. App. 3d 630, 641-42, 360 N.E.2d 1324, 1332 (1977).

Any error was harmless.  Plaintiff is not entitled to a new trial now unless the error prejudiced the rights of a party and a reasonable basis supports a conclusion that, absent the error, the verdict might have been different.  
Khatib v. McDon­

ald
, 87 Ill. App. 3d 1087, 1098, 410 N.E.2d 266, 275 (1980).  The length of time the bands were intended to have been in place has limited rele­vance because the bands were, in fact, removed in less than 48 hours.  The bands were placed on Chelsey on March 19, 1987, and removed March 20, 1987.  The risk to Chelsey's phrenic nerve was the same regardless of how long the defendant intended the bands to be in place.  Any remaining, improper inference was cured when the trial court instructed the jury that arguments of counsel were not evidence and, if the statement was wrong, the jurors should disregard it.  See 
Bruske v. Arnold
, 44 Ill. 2d 132, 138, 254 N.E.2d 453, 457 (1969); 
Brooke Inns, Inc. v. S&R Hi-Fi & TV
, 249 Ill. App. 3d 1064, 1089, 618 N.E.2d 734, 751 (1993).
 

Finally, plaintiff argues she was denied a fair trial because the trial court declined to excuse juror Howell for cause when he told the court that his father-in-law had had heart surgery performed by the defendant, that his father-in-law's condition was deteriorating, and that, if his father-in-law needed surgery again, he would probably return to defendant.  Howell told the judge he did not believe this would bias him.

The trial court has great discretion in determining whether to excuse a prospective juror for cause.  
Great weight is given to a prospective juror's statement under oath that he can lay aside matters that might indicate bias and that he can render a verdict based on the evidence.  
Marcin v. Kipfer
, 117 Ill. App. 3d 1065, 1067, 454 N.E.2d 370, 372 (1983).  Plain­tiff points to nothing in the appellate record to show Howell's actual bias.

In 
Roach v. Springfield Clinic
, 157 Ill. 2d 29, 623 N.E.2d 246 (1993), the plaintiffs, as in this case, contended, pursuant to 
Marcin
, 117 Ill. App. 3d at 1065, 454 N.E.2d at 370, there was bias 
per
 
se
.  
Marcin
 had held a juror was biased 
per
 
se
 if he was a patient of the defendant doctor.  In 
Roach
, it was dis­closed during trial by a juror that his wife had been a patient of one of the defendant doctors and would return to him if she had future problems.  The supreme court stated:

"The determination of impartiality is not purely objective; it is proper for the court to consider a statement of the juror as evidence of his state of mind. ***

Mere suspicion of bias or impartiality is not evidence and does not disqualify a juror."   
Roach
, 157 Ill. 2d at 48, 623 N.E.2d at 254-55.

While a relationship between a juror and the defendant may give rise to impermissible bias in some circumstances, this should be determined on a case-by-case basis, not by a blanket rule.  The supreme court in 
Roach
 refused to extend the 
Marcin
 holding to juror spouses who are defendant doctors' patients.  
Roach
, 157 Ill. 2d at 48, 623 N.E.2d at 255.  This case is comparable to 
Roach
.  The asserted relationship is more distant here, and no presumption of bias applies.

For all of the above reasons, we affirm.

Affirmed.

STEIGMANN and GARMAN, JJ., concur.