NOTICE: Under Supreme Court Rule 367 a party has 21 days after

the filing of the opinion to request a rehearing. Also, opinions

are subject to modification, correction or withdrawal at anytime

prior to issuance of the mandate by the Clerk of the Court.

Therefore, because the following slip opinion is being made

available prior to the Court's final action in this matter, it

cannot be considered the final decision of the Court. The

official copy of the following opinion will be published by the

Supreme Court's Reporter of Decisions in the Official Reports

advance sheets following final action by the Court.

                                    

              Docket No. 79957--Agenda 17--September 1996.

        PATRICIA HOLTON et al., Appellees, v. MEMORIAL HOSPITAL,

                               Appellant.

                      Opinion filed April 17, 1997.

                                    

     JUSTICE McMORROW delivered the opinion of the court:

     In this appeal we are asked to resolve whether application of

the "loss of chance" doctrine in medical malpractice cases lessens

the plaintiff's burden of proving proximate cause. This question

has caused conflicting opinions among the Illinois appellate court

panels. The loss of chance concept refers to the harm resulting to

a patient when negligent medical treatment is alleged to have

damaged or decreased the patient's chance of survival or recovery,

or to have subjected the patient to an increased risk of harm.

     Defendant, Memorial Hospital, requests this court to reverse

the judgment entered upon the jury's verdict in favor of

plaintiffs, Patricia and Frank Holton. Defendant argues that

plaintiffs failed to establish that any acts or omissions of

defendant's staff proximately caused plaintiffs' injuries.

Alternatively, defendant contends that if the judgment is not

reversed outright it must be reversed and a new trial ordered

because defendant was prejudiced by conduct of plaintiffs' attorney

and by the failure of the trial court to maintain impartiality. In

addition, defendant challenges certain jury instructions, and also

argues that it is entitled to a setoff in the amount of Mrs.

Holton's past medical expenses which were reimbursed by insurance.

     We allowed defendant's petition for leave to appeal. 155 Ill.

2d R. 315. For the reasons that follow, we reverse the judgment of

the appellate court and remand for new trial.

                                Background

     In 1991, Patricia Holton and her husband Frank filed suit in

the circuit court of St. Clair County against Memorial Hospital,

Radiological Associates, Limited, and William G. Doubek, M.D.,

seeking damages for Patricia Holton's personal injuries and for

Frank Holton's loss of consortium, which allegedly resulted from

the defendants' negligence. Subsequently, plaintiffs settled their

claims against William Doubek, Radiological Associates, and three

other defendants named in a companion case. The trial court found

that the $2,950,000 settlement was made in good faith and

subsequently dismissed Doubek and Radiological Associates from the

case at bar, leaving Memorial Hospital as the sole remaining

defendant.

     Testimony at trial revealed that Patricia Holton began to

suffer severe back pain in late November or early December 1990.

Her primary care physician, Dr. Doubek, ordered an X ray and a bone

scan. These procedures indicated that the patient suffered from a

degenerative process or compression fracture to a vertebra in her

thoracic spine. Dr. Doubek scheduled Mrs. Holton to undergo a

magnetic resonance imaging (MRI) on January 4, 1991, the earliest

available date for nonemergencies. He also told her to go to the

emergency room if her pain worsened.

     At approximately 9:30 p.m. on December 26, 1990, Mrs. Holton

went to the emergency room of Memorial Hospital in Belleville,

Illinois, complaining of numbness below the waist and a tingling

sensation in her left leg. Dr. Mark Jergens, an emergency room

physician, examined Mrs. Holton. He found evidence of a low fever

and an elevated white blood count, which indicated the presence of

an infection. At this time, according to the trial testimony of Dr.

Jergens, Mrs. Holton had not lost any motor skills. The doctor

ordered a blood culture and a CAT scan. On the medical records Dr.

Jergens noted that thoracic epidural abscess was a possible

explanation for Mrs. Holton's symptoms. An epidural abscess is a

collection of pus in the epidural area adjacent to the membrane

which covers the spinal cord. Because emergency room physicians at

the hospital did not have admitting privileges, Dr. Jergens called

Mrs. Holton's primary care physicians to order her admission to

Memorial Hospital.

     Dr. Doubek examined Mrs. Holton early on the morning of

December 27, 1990, and discovered that she had tingling, numbness,

and weakness in her lower extremities. He was aware that her

symptoms were consistent with either a bone infection called

osteomyelitis or a tumor in her spine. Dr. Doubek ordered a

neurological consultation.

     Dr. Murphy, a neurosurgeon, examined Mrs. Holton in the late

afternoon of December 27, 1990. She complained of numbness in her

abdomen and legs but could still move her extremities. The CAT scan

confirmed the existence of a compression fracture. The radiologist

who interpreted the CAT scan was of the opinion that Mrs. Holton's

pain was caused by a cancerous tumor.

     Mrs. Holton testified that during the day of December 27,

1990, she noticed increasing difficulty in moving her left leg. She

informed her attending nurses of this condition. However, the

nurses' notes state only that the patient did not experience any

significant change in her condition during the day. Between 6 and

7 p.m. on December 27, 1990, Mrs. Holton walked to the bathroom

unassisted. After a few moments she attempted to rise and return to

her bed. However, she could not move her legs or stand up and

noticed a particular problem with numbness in her left leg. She

rang the bell for help. Two nurses aides helped her into a

wheelchair and from there, into her bed. Although she remarked when

the nurses aides helped her from the toilet that her legs "didn't

want to work," neither aide reported this incident to a supervisor,

a nurse, or a doctor.

     Registered nurse Barbara Ford cared for Mrs. Holton during the

shift between 11 p.m. on December 27, 1990, and 7 a.m. on December

28, 1990. At some time between 1 a.m. and 5 a.m. on December 28,

Nurse Ford determined that Mrs. Holton was having difficulties

moving her left leg, but she did not believe that this was a

significant change of condition.

     After the next change in nursing shifts, between 8 and 9 a.m.

on December 28, Mrs. Holton complained of numbness from the waist

down and an inability to move her legs except for very slight

movement in her right foot. She also lost bowel and bladder

control. The nurse then on duty, Susan Schindler, informed Dr.

Doubek and the neurosurgeon on call of these developments. Dr.

Doubek came immediately and confirmed that Mrs. Holton had suffered

a complete loss of motor control below the waist. Dr. Sprich, the

neurosurgeon on call for Dr. Murphy, ordered tests to determine

where the pressure on the spinal cord was located.

     Dr. Doubek testified at trial that at the time of his

diagnosis he was operating under the assumption that Mrs. Holton

had suffered a sudden onset of paralysis because he had not been

informed otherwise by the hospital staff or the charts and records.

Accordingly, he initially thought it likely that her condition was

caused by a tumor-caused infarct of the blood supply to the spinal

cord, which would be consistent with sudden and complete loss of

motor function. Defendant's nursing staff did not tell Dr. Doubek

that Mrs. Holton's numbness and other symptoms of sensory deficits

had been progressing over several hours to a state of motor

impairment or partial paralysis. According to the neurological

evidence adduced at trial, this escalation from tingling and

numbness to paresis, or partial loss of motor function, indicates

spinal cord compression caused by osteomyelitis (infection of the

bone). Osteomyelitis can cause either an inflammation or an abscess

that puts pressure on the spine, resulting in the progression of

paralysis. Because Dr. Doubek was unaware that Mrs. Holton's

apparently sudden paralysis had been preceded by a more gradual

onset of declining motor function, Dr. Doubek determined that the

most likely cause of plaintiff's condition was a cancerous tumor,

requiring radiation.

     Similarly, Dr. Sprich, the neurosurgeon on call for Dr.

Murphy, testified that he would have come to the hospital

immediately if he had been informed that Mrs. Holton was beginning

to have trouble walking and moving her legs. By the time she lost

bowel and bladder function, according to Dr. Sprich, her condition

was irreversible. He further testified that patients suffering from

neurological conditions whose symptoms are consistent with epidural

abscess can usually be beneficially treated because there is

sufficient time to confirm the diagnosis and perform surgery to

ease the pressure on the spinal cord. Dr. Sprich testified that if

cord compression caused by an epidural abscess is diagnosed within

24 hours of the occurrence of paresis, patients often have "an

excellent neurological recovery" and, if caught at an early enough

point in the paresis, such patients will be able to "move their

legs."

     Dr. Doubek and Dr. Sprich also explained why they agreed that

the apparently sudden onset of Mrs. Holton's paralysis supported

the diagnosis of cancerous tumor rather than osteomyelitis.

Osteomyelitis is a rare occurrence in the absence of a prior

surgical intervention or trauma to the spinal cord, and Mrs. Holton

did not have such a history. Also, statistical probabilities

favored the existence of cancerous tumor under the perceived

suddenness of the paralysis, especially where, as here, there was

no involvement of the disc area of the spine. Consequently, the

doctors who diagnosed and treated Mrs. Holton concluded that the

cause of her condition was a cancerous tumor and proceeded to treat

her based upon that mistaken assumption.

     On January 17, 1991, three weeks after her loss of motor

function, Mrs. Holton's family transferred her to another hospital

because she was not improving. At that hospital, Mrs. Holton was

diagnosed with and treated for osteomyelitis. Her current condition

is paraplegia with bladder and bowel involvement due to a spinal

injury caused by upper thoracic vertebra osteomyelitis.

     Following the trial, the jury returned a verdict against

Memorial Hospital and in favor of Mrs. Holton in the amount of

$8,706,500 and a verdict in favor of Mr. Holton on his loss of

consortium claim in the amount of $110,000. Defendant filed a post

trial motion seeking alternative relief including judgment n.o.v.,

a new trial on all issues, a new trial on damages only, and a

remittitur of Mrs. Holton's future medical expenses. Defendant

further sought to have its liability reduced by the amount of the

plaintiffs' settlement with other defendants. The circuit court

granted a remittitur in the amount of $1,500,000 but denied

defendant's motion in all other respects.

     The appellate court affirmed the judgment of the circuit

court, as modified to reflect a reduction of the verdict by the

amount of plaintiffs' settlement with other defendants, $2,950,000,

pursuant to the Contribution Act. 274 Ill. App. 3d 868. The amount

awarded to plaintiffs, as reduced on appeal, totals $4,366,500.

                                 Analysis

     In this court, defendant challenges plaintiffs' proof of

proximate causation and challenges the propriety of certain jury

instructions. Defendant further argues that it was denied a fair

trial because of plaintiffs' counsel's prejudicial remarks and a

statement of the trial judge that damaged the credibility of

defendant's attorneys and one of its witnesses. Finally, defendant

contends that the trial court erred in refusing to set off from the

judgment the amount of Mrs. Holton's medical expenses reimbursed by

insurance. We address these contentions in turn.

                                     I

     Defendant first argues that the appellate court's opinion in

the case at bar improperly altered, diminished, or diluted

plaintiffs' burden of proving that defendant's negligence

proximately caused plaintiffs' injuries. According to defendant,

the appellate decisions "are in patent conflict on the sufficiency

of evidence necessary to prove proximate causation in a medical

malpractice case." See generally Comment, Lost Chance of Survival

in Illinois: The Need for Guidance from the Illinois Supreme Court,

23 Loy. U. Chi. L.J. 155, 156 (1991). One line of decisions holds

that proximate cause may be established by evidence, to a

reasonable degree of medical certainty, that the hospital, doctor,

or other health care provider "increased the risk of harm" to

plaintiff or "lessened the effectiveness" of plaintiff's treatment

by the defendant's negligent conduct. See, e.g., Hajian v. Holy

Family Hospital, 273 Ill. App. 3d 932, 939 (1st Dist. 1995); Galvin

v. Olysav, 212 Ill. App. 3d 399, 403 (5th Dist. 1991); Chambers v.

Rush-Presbyterian-St. Luke's Medical Center, 155 Ill. App. 3d 458,

463-65 (1st Dist. 1987); Northern Trust Co. v. Louis A. Weiss

Memorial Hospital, 143 Ill. App. 3d 479, 487-88 (1st Dist. 1986).

The approach taken in these and similar cases has been termed the

"loss of chance" or "lost chance" doctrine. See generally T. Lavin

& G. Ziebell, Lost Chance of Survival: Is it a Lost Cause in

Illinois? 84 Ill. B.J. 458 (1996).

     Another line of Illinois appellate cases has rejected the loss

of chance doctrine as giving rise to a relaxed standard of

proximate cause, one that is too conjectural to satisfy the

traditional test of proximate causation. See, e.g., Netto v.

Goldenberg, 266 Ill. App. 3d 174, 180-81 (2d Dist. 1994); Hare v.

Foster G. McGaw Hospital, 192 Ill. App. 3d 1031, 1038 (1st Dist.

1989); Russell v. Subbiah, 149 Ill. App. 3d 268 (3d Dist. 1986);

Curry v. Summer, 136 Ill. App. 3d 468, 476 (4th Dist. 1985).

     Defendant contends that the appellate court's application of

the "lost chance" doctrine in the case at bar allowed plaintiffs to

establish their cause of action without being held to the

traditional standard of proving causation approved by this court in

Borowski v. Von Solbrig, 60 Ill. 2d 418, 424 (1975). Borowski

requires proof of causation by the preponderance of evidence,

otherwise referred to as the "more probably true than not true"

standard, that the negligence complained of caused plaintiff's

injury. Before evaluating the conflicting appellate decisions cited

above, we revisit the Borowski standard of proximate causation in

medical malpractice actions, and determine whether, under that

standard, plaintiffs' evidence was sufficient to withstand

defendant's motion for judgment notwithstanding the verdict.

                                     A

     In Borowski, this court did not directly address the loss of

chance doctrine. Instead, the issue relevant to causation was

whether an injured plaintiff who allegedly received negligent

medical treatment could establish proximate cause without

presenting evidence that a better result would have obtained if

proper treatment had been administered. The plaintiff in Borowski

was struck by an automobile while crossing a street and received

severe injuries to his legs. The medical malpractice claim arose

from the defendant hospital's alleged negligence in its treatment

of the plaintiff's injuries, which resulted in the amputation of

the plaintiff's left leg. The plaintiff's expert witnesses

testified that in their opinion, plaintiff's leg could have been

successfully repaired had proper tests been performed and

procedures followed, and that delay in the plaintiff's surgery was

a proximate cause of the amputation. Defendants countered that

there was insufficient evidence to support the verdict in favor of

plaintiff on the causation issue. Further, defendants contended

that they were "entitled to judgment because the evidence d[id] not

establish that a better result would have been obtained if proper

treatment were administered." Borowski, 60 Ill. 2d at 424.

     This court rejected the defendants' argument, stating that it

was "unnecessary to extend the burden-of-proof requirements of a

medical malpractice case beyond those of an ordinary negligence

case by adding the further requirement that the plaintiff prove a

better result would have been achieved absent the alleged

negligence of the doctor." Borowski, 60 Ill. 2d at 424. The court

reiterated that under accepted Illinois Pattern Jury Instructions,

plaintiff's burden of proving that defendants' negligence was the

proximate cause of his injury was sustainable by proof that the

proposition in issue--defendants' breach of duty caused plaintiff's

injury--was more probably true than not true. Addressing the

defendants' contention that the jury should not be permitted to

speculate upon the relative amount of injury attributable to the

fracture caused by the original accident and the amount

attributable to the malpractice, the Borowski court stated,

"[Speculation] can be guarded against by the use of appropriate

instructions to the jury. It is not necessary to become involved in

all of the collateral ramifications that the `better result' test

could inject into a case." Borowski, 60 Ill. 2d at 424.

     We reaffirm the Borowski holding. The traditional statement of

proximate cause requires plaintiff to prove that defendant's

negligence "more probably than not" caused plaintiff's injury. The

"better result test" is not a part of plaintiff's burden of proof.

Issues involving proximate cause are fact specific and therefore

uniquely for the jury's determination. When a plaintiff comes to a

hospital already injured, as in the case of Borowski, or has an

existing undiagnosed medical condition, as in the case at bar, and

while in the care of the hospital is negligently treated, the

question of whether the defendant's negligent treatment is a

proximate cause of plaintiff's ultimate injury is ordinarily one of

fact for the jury.

     In the case at bar, defendant asserts that it was entitled to

judgment as a matter of law for the failure of plaintiffs to

present expert testimony that an earlier call to Mrs. Holton's

physicians would have prevented her paralysis. In light of

Borowski's rejection of the "better result" test, Mrs. Holton was

not required to prove that an earlier call to her physicians would

have resulted in a more favorable outcome. Moreover, Mrs. Holton

did not base her case solely on defendant's delay in the reporting

of her condition. Instead, she contended that the failure of

defendant's nursing staff to accurately report the progression of

her decline into paresis was a proximate cause of her paralysis.

The record contains evidentiary support for plaintiffs' theory.

Both Dr. Sprich and Dr. Doubek explained that they based their

erroneous diagnosis and treatment decisions upon inaccurate and

incomplete information regarding Mrs. Holton's condition in the

hours preceding her total loss of motor control. Dr. Sprich

testified that when a patient's paresis (partial paralysis) is

detected and treated early enough there is a good probability of

avoiding or minimizing paralysis. Dr. Doubek testified that, to a

reasonable degree of medical certainty, the preferred treatment for

relieving pressure on the spinal cord caused by an abscess or edema

is decompression or drainage. Had the doctors been given the

opportunity to properly diagnose Mrs. Holton's condition based on

accurate and complete information, they would have had the

opportunity to treat her condition by ordering the appropriate

treatment. Because of the hospital's negligent failure to

accurately and timely report Mrs. Holton's symptomotology, the

appropriate treatment was not even considered. In light of these

facts, we conclude that defendant failed to establish that it was

entitled to judgment n.o.v. based on plaintiffs' failure to prove

that an earlier call to the treating physicians would have resulted

in Mrs. Holton's recovery.

     Defendant presents the additional argument that judgment

n.o.v. is justified in the case at bar because Mrs. Holton's

personal physicians rendered ineffective treatment both before and

after being notified of her loss of motor skills; therefore, she

did not establish that her physicians would have acted differently

had they been earlier notified. In support, defendant cites to Gill

v. Foster, 157 Ill. 2d 304 (1993), where summary judgment was

entered in favor of the defendant hospital despite the failure of

a nurse to notify a physician that a patient being discharged from

the hospital complained of chest pains. Gill held that summary

judgment was appropriate in that case because there was no

indication that the doctor, who was aware of his patient's

complaint and had decided it was not significant, would have done

anything differently had the nurse repeated the patient's complaint

to the doctor.

     Gill is inapposite to case at bar because in that case the

nurse's report of the complaint would not have caused any further

action on the part of the doctor. In contrast, there is testimony

in the instant case that the doctors would have undertaken a

different course of treatment had they been accurately and promptly

apprised of their patient's progressive paresis.

     Judgment notwithstanding the verdict should not be entered

unless the evidence, when viewed in the light most favorable to the

opponent, so overwhelmingly favors the movant that no contrary

verdict based on that evidence could ever stand. See, e.g.,

Pasquale v. Speed Products Engineering, 166 Ill. 2d 337, 351

(1995). We do not believe that the evidence in the case at bar so

overwhelming favors defendant that no verdict contrary to defendant

could ever stand. Mrs. Holton's treating physicians testified that

they based their erroneous diagnosis and treatment decisions upon

their belief that their patient's paralysis was of sudden onset

rather than having been preceded by approximately 14 to 18 hours of

paresis. It is uncontested that neither of the nurses aides who

assisted Mrs. Holton into a wheelchair when her legs stopped

working during the evening of December 28, 1990, informed the duty

nurse or a doctor of the patient's motor impairment. It also

appears uncontested that the nurses who were on duty during the

hours after the bathroom incident did not report Mrs. Holton's

difficulties in moving her legs as a significant change in her

condition. It was not until she lost bladder and bowel function

along with all ability to move her legs that the nurse on duty

reported Mrs. Holton's condition to her doctors. While the parties'

expert opinion testimony differs with respect to the consequences

flowing from the nursing staff's failure to accurately and promptly

apprise the doctors of Mrs. Holton's deteriorating motor ability,

the record evidence permits the inference that defendant's

negligent acts and omissions prevented her physicians from

correctly diagnosing and treating her condition. We conclude that

the evidence supports the jury's verdict. See, e.g., Wodziak v.

Kash, 278 Ill. App. 3d 901 (1996) (holding that evidence was

sufficient to establish that defendant's delay in diagnosing the

decedent's illness lessened the effectiveness of the treatment and

that plaintiff was not required to show in absolute terms that a

different outcome would have occurred had the defendant made an

earlier diagnosis of the decedent's condition).

     We note that the Borowski court's formulation of proximate

cause in the context of medical malpractice litigation is the same

standard of proximate cause that is used in other types of

negligence actions. Although it may appear more difficult to assess

exactly what harm negligent medical treatment may have caused when

the patient had a preexisting illness or injury, juries routinely

are asked to determine whether, and to what extent, a defendant's

negligent treatment proximately caused the injury upon which the

patient's lawsuit is based. An Illinois Pattern Jury Instruction

(IPI) on proximate cause that was given in the case at bar explains

that the defendant's negligence need only be a cause of the harm,

or "any cause which, in the natural or probable sequence, produced

the injury" of the plaintiff, not "the only cause, nor the last or

nearest cause. It is sufficient if it concurs with some other cause

acting at the same time, which in combination with it, causes the

injury." Illinois Pattern Jury Instructions, Civil, No. 15.01 (3d

ed. 1995) (hereinafter IPI Civil 3d). Under the Borowski standard,

plaintiff met her evidentiary burden of proving the elements of her

case. Accordingly, we hold that, based on the evidence of record,

defendant was not entitled to judgment as a matter of law, and the

trial court did not err in denying defendant's motion for judgment

notwithstanding the verdict.

                                     B

     Our conclusion that defendant was not entitled to judgment as

a matter of law does not directly resolve defendant's contention

that the appellate court's reliance on the loss of chance doctrine

lessened plaintiffs' burden of proving proximate cause. Because our

review of the conflicting appellate cases reveals a significant and

ongoing dispute over the application of the loss of chance doctrine

in medical malpractice actions, we further consider the issue.

     "Lost chance" or "loss of chance" in medical malpractice

actions refers to the injury sustained by a plaintiff whose medical

providers are alleged to have negligently deprived the plaintiff of

a chance to survive or recover from a health problem, or where the

malpractice has lessened the effectiveness of treatment or

increased the risk of an unfavorable outcome to the plaintiff.

Under the traditional formulation of proximate cause, as reflected

in Borowski, the plaintiff must prove that defendant's alleged

medical malpractice more probably than not caused the claimed

injury. Where there is evidence that a plaintiff's estimated chance

of surviving or recovering from an existing illness or injury,

absent the malpractice, is 50% or less, some courts have concluded

that proximate cause under the traditional definition is lacking.

In such cases, courts have entered judgments in favor of defendants

as a matter of law. See, e.g., Russell v. Subbiah, 149 Ill. App. 3d

268 (1986) (entering summary judgment for defendant where evidence

showed a 50/50 chance that a doctor's negligence contributed to

plaintiff's prolonged recovery); see also Curry v. Summer, 136 Ill.

App. 3d 468, 476-80 (1985) (noting in dicta that plaintiff must

show better than even chance of survival absent alleged malpractice

to sustain burden of proof on proximate cause).

     Other courts have recognized that victims of medical

malpractice should be able to seek damages arising from their

doctors' or hospitals' negligent treatment, notwithstanding that

the patients' chance of recovering from existing illnesses or

injuries may be less than 50%. See, e.g., Chambers v. Rush-

Presbyterian-St. Luke's Medical Center, 155 Ill. App. 3d 458, 463-

65 (1987) (evidence indicating that decedent had only a 33% chance

of surviving an undetected cancer even with prompt diagnosis and

treatment did not require conclusion that defendant's negligent

inducement of brain-damaging coma did not proximately cause

patient's death).

     Although the legal literature and case law reflect varying

perceptions and applications of the loss of chance doctrine, in

general two opposing views of the doctrine have emerged--the

"relaxed causation" approach and the "separate injury" approach.

See 84 Ill. B.J. at 459. In Illinois, most of the controversy stems

from a divergence in viewpoint as to whether the loss of chance

doctrine relaxes the traditional proximate cause standard in

medical malpractice actions (see, e.g., Netto v. Goldenberg, 266

Ill. App. 3d 174, 180-81 (1994); Hare v. Foster G. McGaw Hospital,

192 Ill. App. 3d 1031, 1038 (1989)) or whether the traditional

principles of proximate cause are satisfied by and can be

harmonized with the loss of chance concept (see, e.g, Hajian v.

Holy Family Hospital, 273 Ill. App. 3d 932, 940 (1995); Chambers v.

Rush-Presbyterian-St. Luke's Medical Center, 155 Ill. App. 3d 458,

463-65 (1987)).

     Northern Trust Co. v. Louis A. Weiss Memorial Hospital, 143

Ill. App. 3d 479 (1986), was the first Illinois case to

specifically identify and approve the loss of chance concept, in

the context of deciding whether proximate causation could be

established by evidence that the defendant's conduct "lessened the

effectiveness" of the treatment or "increased the risk of harm" to

a patient. In Northern Trust Co., the defendant hospital was found

liable for injuries arising from the medical care given to a

newborn infant. Although the individual nurses and doctors involved

were found not liable in negligence, the jury's verdict against the

hospital was upheld on the ground that the hospital was negligent

for its failure to provide a specially trained nurse to supervise

the nursery in accordance with board of health regulations.

     With respect to the issue of causation, the hospital in

Northern Trust Co. claimed that its failure to provide a specially

trained nurse was not a proximate cause of the baby's brain damage.

However, the court cited evidence which indicated that a trained

nurse would have known from the symptoms that the baby's condition

was deteriorating and, had notification of such condition been made

without the 6½-hour delay that occurred in the case, the baby's

brain damage and retardation could have been prevented or reduced.

The expert evidence indicated that the delay increased the

likelihood of permanent damage. The court reviewed cases from other

jurisdictions and examined section 323 of the Restatement (Second)

of Torts (1965), which provides that "[o]ne who undertakes *** to

render services to another which he should recognize as necessary

for the protection of the other's person or things, is subject to

liability to the other for physical harm resulting from his failure

to exercise reasonable care to perform his undertaking, if (a) his

failure to exercise such care increases the risk of such harm ***."

The Northern Trust Co. court concluded that "the better rule is

that `[e]vidence which shows to a reasonable certainty that

negligent delay in diagnosis or treatment *** lessened the

effectiveness of treatment is sufficient to establish proximate

cause.' " (Emphasis added.) Northern Trust Co., 143 Ill. App. 3d at

487.

     We believe that the "reasonable certainty" language referenced

above conforms to traditional principles of proximate cause.

Similarly, in Chambers v. Rush-Presbyterian-St. Luke's Medical

Center, 155 Ill. App. 3d 458 (1987), the court cited the reasoning

in Northern Trust Co. and upheld a medical malpractice verdict for

a plaintiff against the hospital's claim that the plaintiff failed

to establish that the cause of death was defendant's negligence

rather than the decedent's preexisting terminal cancer. In

Chambers, the plaintiff asserted that the defendant hospital

negligently treated the plaintiff's decedent, causing him to lapse

into a coma caused by high blood sugar. The patient suffered brain

damage as a result of the coma and received no treatment for a

cancer that subsequently was discovered during his autopsy. A

contested issue raised in defendant's appeal centered upon the

cause of death and whether plaintiff had adequately proved that

defendant's negligence proximately caused the patient's death, as

opposed to the cancer itself. The Chambers court cited the Borowski

decision for the proposition that a plaintiff is not required to

prove that a better result would have been obtained absent the

malpractice. The court also acknowledged that the circumstances

were more problematic when evidence existed that both medical

malpractice and an underlying disease or injury caused the

patient's death. Nevertheless, the Chambers court rejected

defendants' contention that the plaintiff did not sustain her

burden of proving proximate cause because of her failure to

demonstrate that decedent had more than a 50% chance of surviving

the cancer had he not been put into a coma through the negligence

of the hospital. Chambers, 155 Ill. App. 3d at 463.

     We conclude that Northern Trust Co. and Chambers reflect the

correct application of proximate causation principles when a

defendant's negligent medical care is alleged to have denied the

patient a chance of survival or recovery. We note, however, that

other appellate decisions have expressly departed from the

rationale of Northern Trust Co. and Chambers on the ground that the

loss of chance analysis in those decisions altered or eliminated

plaintiffs' burden of proving proximate cause. See Hare v. Foster

G. McGaw Hospital, 192 Ill. App. 3d 1031 (1st Dist. 1989); Netto v.

Goldenberg, 266 Ill. App. 3d 174, 180-81 (2d Dist. 1994). Another

recent appellate decision has, in turn, rejected the Hare and Netto

analysis and held that loss of chance theory may be harmonized with

the traditional standard of proof set forth in Borowski. See Hajian

v. Holy Family Hospital, 273 Ill. App. 3d 932 (1st. Dist. 1995),

citing Pumala v. Sipos, 163 Ill. App. 3d 1093 (2d Dist. 1987). We

briefly discuss each of these cases.

     Hare was a survival and wrongful death action in which the

decedent, who suffered from an untreatable condition, had been

turned away from defendant hospital. The appellate court affirmed

a directed verdict entered in favor of defendant on the ground that

plaintiff failed to establish the requisite causal connection

between the defendant's allegedly negligent failure to hospitalize

plaintiff's decedent and the patient's death from his untreatable

fatal illness. Because the evidence revealed that no medical

treatment was available for the decedent's fatal illness, the Hare

court determined that plaintiff had not established that the

defendant's failure to hospitalize the decedent "more probably than

not" was a cause of his death.

     Instead of simply holding that the directed verdict was proper

because of insufficient evidence of proximate cause, the Hare court

went on to discuss the development of the loss of chance doctrine

and the conflicting interpretations of what standard of proof is

required to establish proximate cause. Apparently believing that

the Borowski standard of proximate cause would be undermined by

recognition of the loss of chance concept, the Hare court expressly

declined to follow the lead of such cases as Northern Trust Co. and

Chambers, stating, "[A]ny alteration in the burden of proof

regarding proximate cause as was done in [Hamil v. Bashline, 481

Pa. 256, 392 A.2d 1280 (1978)] would have to come from the supreme

court." Hare, 192 Ill. App. 3d at 1038.

     The Second District of the Appellate Court, in Netto, adopted

the Hare court's view that the loss of chance doctrine lessened

plaintiffs' burden of proving proximate cause and further expressed

its belief that "the Northern Trust Co. and Chambers courts removed

the proximate cause element from medical negligence actions."

(Emphasis added.) Netto, 266 Ill. App. 3d at 181. The Netto court's

disapproval of the loss of chance doctrine occurred in the context

of reviewing the plaintiff's non-IPI instruction purporting to

state a loss of chance theory. However, the Netto court did not

hold that the plaintiff's evidence of proximate cause was

inadequate and, in fact, reversed the judgment entered upon jury

verdict in favor of defendant and remanded for new trial because of

error.

     In Pumala v. Sipos, 163 Ill. App. 3d 1093 (1987), another

panel of the Second District observed that a plaintiff need not

prove that a better result would have occurred absent the alleged

malpractice, consistent with Borowski, but also emphasized that a

plaintiff, to establish proximate cause, must show with a

reasonable degree of medical certainty that the negligent delay in

diagnosis or treatment lessened the effectiveness of the medical

services rendered to the plaintiff. Pumala, 163 Ill. App. 3d at

1098, citing Northern Trust Co, 143 Ill. App. 3d 479. The Pumala

court affirmed the trial court's order directing a verdict in favor

of the defendant in that case, however, because the evidence did

not establish the requisite nexus between the alleged malpractice

and plaintiff's injury.

     Finally, in Hajian v. Holy Family Hospital, 273 Ill. App. 3d

932 (1995), a panel of the First District of the Appellate Court

engaged in a thorough analysis of the loss of chance doctrine and

followed the reasoning of Pumala. The court in Hajian stated, "We

do not agree with [Netto's] interpretation of Northern Trust and

its progeny, but rather, would resolve the conflict by harmonizing

the language of Northern Trust and Borowski as was attempted in

Pumala [v. Sipos, 163 Ill. App. 3d 1093 (1987)]." Hajian, 273 Ill.

App. 3d at 940.

     As the above examination of the case law reveals, individual

decisions may be properly decided upon their facts yet still

conflict with other decisions in their analysis of the loss of

chance doctrine. The reasoning of the appellate panels in Pumala

and Hajian is consistent with Northern Trust Co. and Chambers and,

in our view, reflects the correct understanding of the loss of

chance concept. Conversely, decisions such as Hare and Netto

misleadingly suggest that loss of chance analysis ipso facto

results in a lowered standard of plaintiff's proof of causation.

Although the specific dispositions of the appeals in Hare and Netto

may have been justified, the loss of chance analysis contained in

the decisions has perpetuated confusion as to the proper standard

of proof in medical malpractice cases. Accordingly, we overrule

those cases to the extent that their analysis conflicts with our

holding in the instant case.

     There is nothing novel about requiring health care

professionals to compensate patients who are negligently injured

while in their care. To the extent a plaintiff's chance of recovery

or survival is lessened by the malpractice, he or she should be

able to present evidence to a jury that the defendant's

malpractice, to a reasonable degree of medical certainty,

proximately caused the increased risk of harm or lost chance of

recovery. We therefore reject the reasoning of cases which hold, as

a matter of law, that plaintiffs may not recover for medical

malpractice injuries if they are unable to prove that they would

have enjoyed a greater than 50% chance of survival or recovery

absent the alleged malpractice of the defendant. E.g., Curry, 136

Ill. App. 3d 468; Russell, 149 Ill. App. 3d 268. See Gatlin v.

Ruder, 137 Ill. 2d 284, 292-93 (1990) (specifically disapproving

the Russell court's entry of summary judgment upon evidence that

the patient's chances of survival absent the malpractice was

"50/50"). To hold otherwise would free health care providers from

legal responsibility for even the grossest acts of negligence, as

long as the patient upon whom the malpractice was performed already

suffered an illness or injury that could be quantified by experts

as affording that patient less than a 50% chance of recovering his

or her health.

     Disallowing tort recovery in medical malpractice actions on

the theory that a patient was already too ill to survive or recover

may operate as a disincentive on the part of health care providers

to administer quality medical care to critically ill or injured

patients. Moreover, it has been noted that "[i]t is impossible to

divine who would fall into one category [survivor] or the other

[nonsurvivor]. Not allowing such a case to be decided by a jury

means that statistical proof of a less than 50% chance would be

dispositive, even though no expert in the world could prospectively

state who would survive and who would die. That is why doctors

treat all patients, not just those with better than even odds." 84

Ill. B.J. at 462.

     We hold that the loss of chance concept, when properly

analyzed, does not relax or lower plaintiffs' burden of proving

causation. Rather, the concept comports with the Borowski standard.

                              II. Trial Error

     Although we have held that defendant was not entitled to

judgment notwithstanding the verdict, we conclude that defendant is

entitled to a new trial because of certain errors which had a

strong probability of prejudicing the jury. Specifically, we

determine that the trial judge's admonition to the jury that one of

the defense witnesses gave inaccurate testimony on a collateral

issue and was encouraged to do so by defendant's attorneys, coupled

with plaintiffs' counsel's repeated charges of defendant's

fraudulent misconduct, constituted reversible error under the

circumstances of this case.

     To explain why these errors require the granting of a new

trial it is necessary to consider the factual context in which the

errors occurred. During trial, plaintiffs' counsel attempted to

demonstrate that defendant and its attorneys had coached key

witnesses for defendant to change their deposition testimony to

better fit the defense theory. By vigorous cross-examination and

through repeated remarks during closing argument, plaintiffs'

counsel vehemently argued the possibility that the hospital had

engaged in an attempt to cover up the nursing staff's negligence by

falsifying testimony. Additionally, because of an incident that

occurred just after Dr. Jergens' testimony in defendant's case,

plaintiffs' counsel apparently became convinced that defendant's

attorneys had encouraged Dr. Jergens to give false testimony with

regard to whether the doctor was a defendant in a companion lawsuit

filed by plaintiffs. Although the issue of Dr. Jergens' status as

a defendant in a different case was collateral to the trial issues,

plaintiffs' counsel subsequently asserted to the trial judge in

conference that Dr. Jergens had committed perjury, and that

defendant's counsel had aided and abetted such perjury.

     The following facts taken from the record are relevant to this

issue. Dr. Jergens, the emergency room physician on duty at the

time of Mrs. Holton's admission, was asked at the end of his cross-

examination the following question by plaintiffs' counsel, Bruce

Cook:

     "Q. You understand, do you not, sir, that you are a defendant

in a companion case to this one? Are your aware of that?

     A. I'm not aware of that."

     At the time of this question, Dr. Jergens had not been

formally served with summons and a copy of the complaint in a

companion lawsuit that plaintiffs had filed approximately a year

before the trial in the instant case. In fact, according to a

discussion in the transcript it appears that at the beginning of

trial, Cook had told defendant's lead trial counsel, Sandberg, that

he believed the other lawsuit had been dismissed. Moreover, as is

clear from the attorneys' arguments to the judge outside the

presence of the jury, the two attorneys disagreed as to whether a

person is properly considered a party defendant if he or she has

been named in a complaint but has never been served with process.

Sandberg maintained that Dr. Jergens was not a party in the

companion lawsuit until he was served with process. More

importantly, Sandberg argued that the doctor's potential status as

a defendant in a separate lawsuit was a collateral issue of no

relevance to the pending trial. In contrast, plaintiffs' counsel

took the position that if Dr. Jergens was aware of the existence of

the other lawsuit, he did not answer truthfully when questioned

during cross-examination as to his awareness of being a defendant

in that suit. Over objection, and in the jury's presence, the court

took judicial notice of Dr. Jergens' party status and allowed

plaintiffs' counsel to inform the jury, "Mark Jergens, who just

testified, is a party defendant in a pending lawsuit where my

clients have filed suit against him."

     If that had been the end of the matter, no real prejudice to

defendant would have resulted because Dr. Jergens' status as a

party defendant in another lawsuit would have been relevant only to

show a potential bias in his testimony, which is an appropriate use

of cross-examination. However, instead of treating the dispute over

Dr. Jergens' party status as a difference of legal opinion,

plaintiffs' attorney chose to treat the doctor's answer as perjury

and to accuse opposing counsel of suborning or inducing such

perjury. In support of these serious charges, Cook informed the

court that after Dr. Jergens left the courtroom following his

testimony, the doctor fled when an employee of Cook's law firm

attempted to serve him with the complaint and summons in the

separate suit. Although service was effected, plaintiffs' counsel

demanded to have the witness brought back for further questioning,

claiming that the incident proved that Dr. Jergens knowingly

deceived the court when he denied awareness of being a defendant in

the other lawsuit. According to Cook, defendant's attorneys must

have warned Dr. Jergens to evade service, which indicated that

defendant's attorneys "again" were engaged in "inducing" a witness

to "tell a lie under oath."

     Sandberg acknowledged that Dr. Jergens was aware of the

existence of the separate lawsuit but denied that he had instructed

Dr. Jergens how to answer the question because the issue had

"nothing to do with this lawsuit." Sandberg also told the court

that when he saw the papers for the lawsuit lying on counsel table

he informed Dr. Jergens of the likelihood that plaintiffs' counsel

would attempt to effect service. However, Sandberg reiterated his

belief that Dr. Jergens, who had not been served with the separate

suit at the time he testified, honestly stated his understanding of

his party status and did not give a false or inaccurate response to

Cook's question.

     When Dr. Jergens returned to court the same afternoon in

response to the trial judge's order, he was questioned at some

length outside the presence of the jury. Dr. Jergens testified that

he knew of the existence of the companion lawsuit. He had formerly

worked at Memorial Hospital and had been deposed in the pending

lawsuit. It was his understanding, based on information from "many

sources," including defendant's attorneys, that he was not a party

defendant in the companion suit until formal service of summons was

effected. Dr. Jergens, who is not an Illinois resident, explained

that he ran from plaintiffs' process server as he was leaving court

because he did not want to be served with the lawsuit. He had asked

Kristen Hines, the hospital's in-house counsel, what to do to avoid

service and she told him to leave quickly. Dr. Jergens denied that

either Hines or Sandberg had told him how to answer if Cook

inquired upon cross-examination whether he was a defendant in the

other lawsuit.

     During his questioning of Dr. Jergens outside the presence of

the jury, Cook argued with the witness over the honesty of his

belief that he was not a party in the separate suit, and outright

accused Dr. Jergens of lying to the jury at trial. Then, when

Sandberg remarked that the questioning was getting a "bit far

afield," Cook replied, "You're about ready to go in the slammer

here in a second ***." He referred to Hines as Sandberg's

"henchman" who advised the witness to flee. Continuously during the

hearing, Cook made remarks questioning the ethics of opposing

counsel and impugning their integrity and honesty.

     Despite his hostile characterization of the situation, Cook

offered the trial court no authority to support his contention that

Dr. Jergens' testimony regarding his status as a party was legally

incorrect. Nor did he explain in what manner Dr. Jergens' answer

was factually untruthful. Nonetheless, he moved the court to hold

Dr. Jergens and the two attorneys for the hospital in contempt. He

stated that defendant's lawyers, Hines and Sandberg, should be

reported to the Attorney Registration and Disciplinary Commission.

Finally, Cook orally moved the court to strike the hospital's

pleadings, which would have the effect of defaulting defendant. He

told the court, "As a practical matter, Judge, you probably should

issue a directed verdict in my behalf anyway on the issue of

negligence. We'll save a lot of time. The doctor won't have to

spend another day. Ms. Hines and Mr. Sandberg rather than having to

be jailed will *** get their names in the books in the Appellate

Court when they appeal it."

     Although the trial judge did not impose the severe sanction of

striking the hospital's answer, the court concluded that Sandberg

had been untruthful when he denied discussing the companion suit

with Dr. Jergens, and further concluded that the veracity of Dr.

Jergens on this collateral matter of his party status was

"important, very, very important." Consequently, the trial judge

read the following statement to the jury at the next session of

court, just before closing statements:

               "Yesterday afternoon out of your presence, we

          conducted a hearing concerning Dr. Mark Jergens'

          testimony. I determined at the hearing that the doctor's

          testimony concerning his knowledge of a lawsuit pending

          against him was not true. I further determined that Ms.

          Hines and Mr. Sandberg knew the statement was false and

          had done certain things that encouraged the doctor to

          believe his answer was accurate. You may consider this

          fact in determining the credibility of Dr. Jergens'

          testimony."

     In our view, the controversy over Dr. Jergens' party status in

a separate lawsuit was a collateral issue of limited if any

relevance to the instant case. This court has noted that if a

question concerns a collateral matter the cross-examining attorney

must accept the answer given and is not allowed to attempt

impeachment on the issue. See Esser v. McIntyre, 169 Ill. 2d 292,

305 (1996); see also Tzystuck v. Chicago Transit Authority, 124

Ill. 2d 226, 242 (1988) (collateral evidence should be excluded to

prevent the jury from becoming distracted from the main issues).

Moreover, because the trial court took judicial notice of Dr.

Jergens' party status, plaintiffs' counsel was able to inform the

jury of the point he wished to make through Dr. Jergens' testimony,

i.e., that the doctor was a party defendant in the collateral

lawsuit. Therefore, we conclude that the trial court should not

have entertained Cook's request to hold a mini-trial into the side

issue of whether Dr. Jergens' party status answer was complete and

accurate.

     Of greater concern are Cook's groundless accusations of

perjury and subornation of perjury in connection with this matter.

The record does not bear out such charges. Dr. Jergens told the

court it was his honest belief that he was not a defendant in the

other suit at the time of his trial testimony because he had not

been served with process. Opinions on points of law, even if

incorrect, are not perjurious. Similarly, a person's honest

understanding of his legal status cannot be viewed as constituting

an intentional misrepresentation of fact. Therefore, Cook's charge

of perjury should have been rejected.

     We also question the basis upon which Cook insisted that

Sandberg lied to the court when he initially denied having

discussed the separate suit with Dr. Jergens. The transcript

indicates that Sandberg subsequently corrected himself by

acknowledging that after seeing the papers for the separate lawsuit

lying on counsel table, he informed the doctor of his belief that

plaintiff planned to serve him in court. Sandberg admitted

discussing the legalities of service of process, but denied that he

had specifically told Dr. Jergens how to answer any questions at

trial concerning Dr. Jergens' party status. Indeed, Sandberg stated

that he did not believe the issue was relevant. Dr. Jergens, in his

testimony, corroborated Sandberg's representations that the subject

of how to answer questions regarding Dr. Jergens' party status was

not discussed. Dr. Jergens also acknowledged having talked to

Sandberg and others in the past regarding the legal significance of

service of process.

     We conclude that the record contains no sound basis for

finding that Sandberg intentionally misled the court. Even if

Sandberg misspoke in his initial denial of having discussed the

separate lawsuit with Dr. Jergens, it is clear from the context

that he was attempting to respond to Cook's specific accusation

that he had coached the witness on how to answer the party status

question. We conclude that Cook's motion for sanctions based on

perjury or subornation of perjury was not supported by the record

and was meritless.

     We hold that the trial court abused its discretion in bringing

to the jury's attention its personal belief that Dr. Jergens had

testified falsely and had been led to do so by defendants'

attorneys. This court has stated that a trial judge should refrain

from conveying to the jury his or her opinions on ultimate matters

of fact or the credibility of witnesses and the weight to be given

their testimony. See People v. Santucci, 24 Ill. 2d 93, 98 (1962).

In the case at bar, the prejudicial impact of the trial court's

statement upon the jury can hardly be overstated. The jury was not

apprised of the legal basis upon which Dr. Jergens' opinion of his

party status rested, nor was the jury told of the circumstances

under which the charge of attorney misconduct was made. Instead,

the trial court told the jury, as proven fact, that Dr. Jergens

had, in effect, lied at the behest of defendant's attorneys and

that the jury could consider that "fact" in determining the

witness' credibility. This undoubtedly had a devastating impact on

the jury's perception of defendant, its lawyers, and its witnesses.

By its unwarranted remarks to the jury, the trial court placed its

neutrality in issue. Therefore, we hold that defendant was denied

a fair trial and is entitled to a new trial. See, e.g., Forest

Preserve District v. Wike, 3 Ill. 2d 49, 57 (1954) (judge should

not make comments reflecting on the integrity of counsel in the

presence of the jury); see generally A. Hartman, The "Whys" and

"Whynots" of Judicial Comments on Evidence in Jury Trials, 23 Loy.

U. Chi. L.J. 1, 19-21 (1991).

     We note further that the prejudicial impact of the trial

judge's remarks was heightened by the immediately following closing

argument of Cook, who riddled his summation with references to

coached and deceitful hospital witnesses and manipulative

attorneys. For example, Cook claimed that the rules of trial had

been "shamelessly ignored" by the defense, including the rule that

attorneys should not "counsel or assist a witness to testify

falsely." Cook commented that the nurses and nurses aides were

"nice people" who had been encouraged to "modify their testimony."

According to Cook, his was the profession of Abraham Lincoln and

Daniel Webster and the Declaration of Independence, while the

defense attorneys profession was that of "John Dean, John

Erlichmann, people who were so interested in winning that they

violated the rules." Cook told the jury that the probable reason

for the "lawyer misconduct in this case" was that Mrs. Holton

sustained terrible damages. He further informed the jury that it

had been the victim of "distortion of the truth" by "the named

partner in a large St. Louis law firm."

     We believe that these remarks were of a type likely to arouse

passion and prejudice in the jury, particularly in light of the

trial judge's comments undermining Dr. Jergens' credibility and the

lawyers' integrity. Therefore, the prejudicial remarks contributed

to the trial court's error and combined with that error to deny

defendant a fair trial under the circumstances.

     It is true that where there is record evidence in support of

a claim that opposing counsel or parties falsified evidence or

encouraged witnesses to change their trial testimony, counsel may

fairly comment upon such evidence. If a witness' trial testimony

significantly differs from his or her deposition testimony,

opposing counsel may exploit such changes by traditional means of

impeachment. However, modifications or additions to a witness'

trial testimony which were not expressly stated in that witness'

pretrial deposition do not, in and of themselves, suggest

deliberate distortion of evidence by the witness or fraudulent

coaching by lawyers. In the case at bar, plaintiffs' counsel

believed that he had obtained damaging admissions from certain

witnesses that defendant or its agents had encouraged them to

change their testimony with respect to Mrs. Holton's condition in

the hours preceding her paralysis. Because we are remanding this

cause for new trial we make no express finding regarding whether

there may have existed a sufficient evidentiary basis to support

some of Cook's remarks indicating that defense counsel coached the

nursing staff witnesses to lie and change their testimony. Although

the appellate court in the instant case observed that there was

evidence sufficient to raise such an inference, the court further

stated that the evidence did not "conclusively" establish that

hospital employees were manipulated or told to testify falsely. We

hold only that the trial in the instant case was fatally tainted by

the improper comments of the trial judge to the jury, coupled with

closing remarks of an unduly prejudicial nature. The evidence of

the hospital's liability was not so overwhelming that we can

characterize the trial error as harmless under the circumstances.

Nor can we conclude that the jury's verdict was unlikely to have

been influenced by the trial court's comments upon the integrity of

defense counsel and the credibility of one of its witnesses,

especially in light of Cook's repeated charges of dishonesty and

attorney misconduct.

                          III. Jury Instructions

     Defendant also challenges certain jury instructions. First,

defendant contends that plaintiffs' instruction no. 13, a non-IPI

instruction, was misleading. This instruction stated that defendant

"owed a duty, independent of any relationship between physician and

patient, to review and supervise the medical care administered to

the plaintiff." According to defendant, this instruction could be

understood as making the hospital liable not only for the acts and

omissions of the nursing staff and emergency room personnel, but

also for any negligence on the part of Dr. Doubek and the other

private physicians who treated Mrs. Holton. According to defendant,

because there was no evidence that the hospital knew or should have

known that plaintiffs' private treating physicians had misdiagnosed

Mrs. Holton's condition or rendered ineffective treatment,

defendant was not vicariously liable for the acts or omissions of

plaintiffs' physicians. Furthermore, defendant argues that the

potential jury confusion over the scope of the hospital's vicarious

liability was demonstrated by the jury's written inquiry to the

court, asking whether "a staff member, i.e., Dr. Doubek, [is] an

officer or employee of the hospital."

     Plaintiffs concede that instruction no. 13 could have been

drafted more narrowly to prevent the jury from speculating whether

any physicians other than Dr. Jergens, the emergency room physician

on call, were included in the group of defendant's employees whose

acts or omissions were legally attributable to defendant. However,

plaintiffs assert that the instruction correctly states the

applicable law, that a hospital has an independent duty to its

patients to review and supervise treatment, and therefore any error

in the instruction was harmless, particularly in view of the

"overwhelming" evidence against defendant.

     In light of our decision to reverse and remand this cause for

new trial we need only note that the instruction should not be

resubmitted in its presently drafted form. We believe that the

jury's question to the court reflects potential confusion over

whether private physicians are considered "staff members" for

purposes of holding the hospital legally responsible for acts and

omissions of the private doctors. Accordingly, on remand any

instruction attempting to state the hospital's duty to supervise

the medical care given its patients should be clearly and

accurately drafted to avoid jury speculation or confusion.

     Defendant next argues that the statement of law in plaintiffs'

instruction no. 24 does not apply to the instant case and should

not have been given. Instruction no. 24 stated, "If a health care

provider is guilty of professional negligence which creates a

condition of the plaintiff's body, then the health care provider is

liable not only for plaintiff's damages resulting from that

condition, but also liable for any damages sustained by the

plaintiff arising from the efforts of subsequent health care

providers to treat the condition caused by the initial health care

provider." According to defendant, this instruction is applicable

only in cases where one tortfeasor "creates a condition" in the

plaintiff and subsequent medical providers improperly treat the

condition, making it worse. See Gertz v. Campbell, 55 Ill. 2d 84

(1973) (negligent driver sued for plaintiff's injuries sustained in

collision and also for subsequent aggravation of injuries from

medical malpractice). Defendant states that it did not create the

condition of osteomyelitis in Mrs. Holton and therefore instruction

no. 24 does not apply to any issue in the case.

     Plaintiffs relied on the case of Daly v. Carmean, 210 Ill.

App. 3d 19 (1991), as authority for submitting this instruction. In

Daly, the appellate court held that an identically worded

instruction was appropriate in the case before it, which involved

a podiatrist who had negligently performed foot surgery upon

plaintiff and caused numerous complications needing subsequent

correction. Daly held that although the instruction properly stated

the doctor's liability for aggravating the plaintiff's initial

condition, the trial court did not abuse its discretion in refusing

the instruction. In the case at bar, plaintiffs do not explain in

what manner Daly assists their contention that instruction no. 24

should have been given. Instead, plaintiffs simply argue that the

instruction is a correct statement of the law "where subsequent

medical treatment may have caused damage to plaintiff."

     We believe that the circumstances of the case at bar are

distinguishable from those of cases such as Daly and Gertz, where

an initial tortfeasor was legally responsible for subsequent

aggravation of the original injury caused by the initial

tortfeasor. The case at bar would be analogous to Gertz and Daly

if, for example, some individual had negligently injured Mrs.

Holton's spine, causing trauma, which resulted in the osteomyelitis

that was subsequently misdiagnosed and incorrectly treated. In such

an example, the original tortfeasor presumably could be found

liable for the damages caused not only by the initial injury to the

spine but also for the subsequent failure on the part of the health

care providers to detect and correct the condition. In the instant

case, however, the facts do not appear to support the giving of an

instruction involving the aggravation of an original tortfeasor's

injury by subsequent medical malpractice. Therefore, we hold that

instruction no. 24 should not be given upon retrial.

     Defendant's remaining challenge to the jury instructions is

that the proximate cause instructions were one-sided, favoring

plaintiffs. According to defendant, the trial court erred in

rejecting one of the optional provisions of an IPI instruction,

which would have allowed the jury to enter verdict in favor of

defendant if the jury found that plaintiffs' injuries were solely

caused by the "conduct of some person other than defendant."

     In instruction no. 15, the jury was given the long form

proximate cause instruction (IPI Civil 3d No. 15.01), which defines

proximate cause as "any cause which, in natural or probable

sequence, produced the injury complained of. It need not be the

only cause, nor the last or nearest cause. It is sufficient if it

concurs with some other cause acting at the same time, which in

combination with it, causes the injury." The jury was also given

IPI Civil 3d No. 12.05, submitted by defendant, which states that

if the jury finds the defendant's negligence was a proximate cause

of plaintiff's injury it is not a defense that "something else may

also have been a cause of the injury." The second paragraph of this

instruction instructs that the verdict should be for defendant if

the jury decides "that the sole proximate cause of injury to the

plaintiff was something other than the conduct of the defendant."

(Emphasis added.) IPI Civil 3d No. 12.05.

     Defendant's specific challenge is to the omission from another

instruction, instruction no. 14, of a sole proximate cause

provision based on conduct of third parties. As given to the jury,

instruction no. 14 stated that "more than one person may be to

blame for causing an injury. If you decide that the defendant was

negligent and that its negligence was a proximate cause of injury

to the plaintiff, it is not a defense that some third person who is

not a party to the suit may also have been to blame." See IPI Civil

3d No. 12.04. According to defendant, the second paragraph of IPI

Civil 3d No. 12.04 should have been included, as follows: "However,

if you decide that the sole proximate cause of injury to the

plaintiff was the conduct of some person other than the defendant,

then your verdict should be for the defendant." Defendant argues

that the inclusion of this provision would have properly allowed

the jury to find that the conduct of Dr. Doubek, Dr. Murphy, or Dr.

Sprich in failing to properly diagnose and treat Mrs. Holton, was

the sole proximate cause of her injury.

     We reject defendant's contention that the trial court abused

its discretion in declining to include the above-quoted provision

in instruction no. 14. A defendant is not automatically entitled to

a sole proximate cause instruction wherever there is evidence that

there may have been more than one, or concurrent, causes of an

injury or where more than one person may have been negligent.

Instead, a sole proximate cause instruction is not appropriate

unless there is evidence that the sole proximate cause (not "a"

proximate cause) of a plaintiff's injury is conduct of another

person or condition. See Ballweg v. City of Springfield, 114 Ill.

2d 107, 121 (1986); cf. Leonardi v. Loyola University, 168 Ill. 2d

83 (1995). The usage notes following IPI Civil 3d No. 12.04 caution

that the sole proximate cause provision "should be used only where

there is evidence tending to show that the sole proximate cause of

the occurrence was the conduct of a third person."

     In the case at bar, defendant did not present evidence or

argue that it was only the negligence of persons other than the

hospital employees which proximately caused plaintiffs' injury.

Instead, defendant attempted to establish that no medical

negligence had occurred at all. Defendant did not charge that

plaintiffs' treating physicians were negligent in their acts or

omissions. On the contrary, much of the defense relied on the

rationale that the treating physicians' diagnosis and treatment

decisions were proper in light of the circumstances in which the

decisions were made. For example, there was evidence that a

cancerous tumor appeared to be the most likely diagnosis based on

the information upon which the treating doctors based their

decisions. The jury, however, found in favor of plaintiffs, under

whose theory of the case defendant's negligence proximately caused

the treating physicians' misdiagnosis. Because neither plaintiffs

nor defendant asserted at trial that the treating physicians

themselves were negligent, we conclude that the trial court did not

err in denying defendant's request for a sole proximate cause

instruction based on the negligence of third parties.

                                    IV

     Finally, defendant claims that it was entitled to a setoff

against the damages award for expenses paid by plaintiffs'

insurance company. Plaintiffs counter that this court's resolution

of the issue would be premature because the issue of the insurer's

subrogation rights has not yet been adjudicated. We decline to

address this issue in light of our reversal of the cause for new

trial because there is no longer a judgment against which to set

off the expenses paid by the insurance company. The parties may

raise any issues regarding insurance reimbursement or subrogation

rights at the appropriate time in the trial court.

     For the foregoing reasons, we agree with the denial of

defendant's motion for judgment notwithstanding the verdict and

hold that plaintiffs sustained their burden of proving proximate

cause pursuant to the Borowski standard. We reverse the judgment of

the appellate court and the judgment of the circuit court entered

upon jury verdicts in favor of plaintiffs and remand for a new

trial because defendant was denied a fair trial.

Appellate court judgment reversed;

                                         circuit court judgment reversed;

                                                          cause remanded.

                                                                         

     CHIEF JUSTICE HEIPLE, specially concurring:

     The majority's opinion is a fine piece of scholarship,

copiously researched and admirably crafted; I even agree with some

of what is in it. I agree, for instance, with the majority's

conclusion that the wholly improper remarks by the plaintiffs'

attorney and the trial judge regarding the credibility of a defense

witness were unduly prejudicial to the defense case and, as a

consequence, the jury verdict for the plaintiffs must be reversed.

I must, however, take issue with the majority's novel analysis

which purports to reconcile the traditional concept of proximate

cause with the so-called "lost chance" doctrine. Accordingly, I

concur only in the judgment.

     Under the traditional standards for submitting a medical

malpractice case to a jury, a plaintiff must produce evidence

showing that his injury was "probably" caused by the defendant's

negligence, meaning simply that it is "more probably true than not"

that the ultimate harm or condition resulted from such negligence.

Borowski v. Von Solbrig, 60 Ill. 2d 418, 424 (1975). In any

negligence case, the standard of proof on the causation issue is

whether, by a preponderance of the evidence, the negligent act or

omission is shown to have been a substantial factor in bringing

about the harm or without which the harm would not have occurred.

Thacker v. UNR Industries, Inc., 151 Ill. 2d 343, 354-55 (1992);

Smith v. Eli Lilly & Co., 137 Ill. 2d 222, 232 (1990). The effect

of these standards is to bar recovery where it is less probable

than not that the defendant's negligence caused the ultimate harm

complained of by the plaintiff.

     The lost chance doctrine, as articulated by the majority,

loosens the traditional proximate cause standard by permitting the

causation issue to go to the jury where there is no evidence of a

reasonable probability that the defendant's negligence caused the

plaintiff's ultimate injury. Indeed, the majority opines that the

plaintiff need only show to a "reasonable certainty" that the

defendant's negligence caused an "increased risk of harm or lost

chance of recovery." What is particularly baffling about the

majority opinion is its steadfast refusal to acknowledge that it is

departing from the traditional proximate cause standard and its

insistence that the lost chance doctrine "comports" with our prior

decisions. This simply is not so. Under the framework set out by

the majority, the lost chance doctrine arises where the traditional

probability standard of causation is not met. Words have meaning,

and despite the majority's assurances otherwise, "reasonable

certainty" means something other than "reasonable probability."

     The law does not, and should not, require proof of an absolute

certainty on causation or any other factual issue. While our

jurisprudence routinely settles for proof amounting to less than an

ontological certitude, how much less? The majority opinion lowers

the threshold below the traditional standard of "reasonable

probability" to a "reasonable certainty." I think this is unwise,

ill-advised and, on the facts of this case, wholly unnecessary.

Proof to a reasonable probability ensures that the possible

explanations for the cause of a plaintiff's injury are sufficiently

narrow to allow a jury to determine liability. To permit a case to

go to a jury on any less evidence invites a jury to impose

liability based on speculation and conjecture.

     We have always required this level of certainty on the issue

of causation before permitting a jury to find a defendant negligent

and to award damages. See, e.g., Ney v. Yellow Cab Co., 2 Ill. 2d

74, 80-81 (1954); Neering v. Illinois Central R.R. Co., 383 Ill.

366, 380 (1943). The majority opinion acknowledges this and quite

rightly resolves the proximate cause issue in this case under our

traditional standard. As the majority holds, and I agree, this case

properly went to the jury because there was evidence that the

nurses' failure to notify the doctors of Mrs. Holton's worsening

condition caused the doctors, at the very least, to prescribe an

inappropriate treatment. There was evidence that if the doctors had

been so informed, they could have arrested Mrs. Holton's

deterioration with medication and could have prevented her

condition from deteriorating as far as it did. Thus, Mrs. Holton

did establish that the defendant's negligence more probably than

not did cause her injury. It necessarily follows, then, that the

majority's discussion of the lost chance doctrine was unnecessary

to the disposition of the case.

     So what then is to be made of the majority's gratuitous

discussion of the lost chance doctrine? It is axiomatic that

statements in a judicial opinion which are not essential to the

disposition of a case or logically necessary to the rationale for

the disposition are not authoritative. Geer v. Kadera, 173 Ill. 2d

398, 414 (1996) ("Dicta is not binding authority under the rule of

stare decisis"); Department of Public Works & Buildings v. Butler

Co., 13 Ill. 2d 537, 545 (1958). As such, a later court--even an

inferior court--is free to reject those parts of an opinion. A

court might issue general pronouncements when it decides a case,

but under stare decisis, those pronouncements are not binding

precedent unless essential to the disposition of the case. The

logic of the rule is quite simple: this court sits to decide real

cases and to prescribe rules of decision (see Ill. Const. 1970,

art. VI, §§1, 4); we are not empowered to promulgate legislation.

Since a court's authority to "make law" is a product of a court's

duty to adjudicate disputes, it follows then that the authority of

a court in any given case extends only to what is needed to resolve

the particular dispute before it.

     Where a rule of law has become established by a series of

decisions--like our traditional proximate cause standard--it should

be followed. The reasons are multitudinous: certainty,

predictability, stability, equity, efficiency and the avoidance of

arbitrary decisionmaking. This principle of stare decisis is as

basic as the rule of law itself, and is the mainstay against the

hubris of a single judge or the tyranny of a shifting majority.

This case in particular illustrates the wisdom of denying

precedential authority to unnecessary verbiage in judicial

opinions. The majority has given precious little thought to how the

lost chance doctrine will affect future cases. There is, for

example, no clear, principled reason why the lost chance doctrine

should not be applied in malpractice actions against other

professionals. Thus, if a disgruntled litigant loses a case that he

probably would not have won, but is able to prove that his lawyer

negligently reduced his chance of winning by some degree, no matter

how small, the litigant would be able to pursue a cause of action

for malpractice against his attorney under the lost chance

doctrine. See Comment, Loss of Chance in Legal Malpractice, 61

Wash. L. Rev. 1479 (1986). Only the client with no chance of

success would be foreclosed from some recovery under the lost

chance doctrine. There is nothing in the majority opinion or unique

to health care professionals that would limit the application of

the lost chance doctrine exclusively to medical malpractice cases.

     The consequences of the majority opinion are far from clear.

I am troubled that the majority has sought to alter the traditional

proximate cause standard without considering the likely expansion

of the lost chance doctrine into other areas of law. I also fear

that the majority's opinion is just one more step along the road to

making medical professionals the insurers of their patients,

rendering health care providers liable without regard to whether

their negligence caused injury to the plaintiff. Our traditional

proximate cause standard provided a safeguard against this sort of

injustice, but the majority proposes to loosen the standard

considerably with the lost chance doctrine. The majority's opinion

may be an accurate prediction of how this court might someday rule

on the lost chance doctrine, but its discussion here amounts to

dicta. Therefore, I consider it still to be an open question

whether the common law of Illinois recognizes the lost chance

doctrine.

     JUSTICE NICKELS, dissenting:

     I agree with the majority's excellent analysis and conclusion

finding that the "loss of chance" doctrine does not lessen a

plaintiff's duty to prove proximate cause in a medical malpractice

action. However, I strongly disagree with the majority's conclusion

that the conduct of the trial court and the plaintiffs' attorney

constitutes reversible error. Therefore, I respectfully dissent.

     

     Initially, I note that the majority is simply incorrect in

asserting that Dr. Jergens' party status in the companion lawsuit

is a collateral matter. The purpose of cross-examination is to test

the credibility of a witness. People v. Collins, 106 Ill. 2d 237,

269 (1985). A matter is considered collateral only if it is

irrelevant for any purpose other than to simply contradict the in-

court testimony of the witness. M. Graham, Cleary & Graham's

Handbook of Illinois Evidence §607.2, at 337 (5th ed. 1990). For

example, what a witness had for lunch, even if contradicted by

other evidence, would not be a proper basis for extrinsic evidence

in a case involving whether a defendant ran a red light. However,

a witness' bias is not a collateral matter and a party may prove

bias by extrinsic evidence. See M. Graham, Cleary & Graham's

Handbook of Illinois Evidence §607.2, at 338 (5th ed. 1990).

     In the instant case, the plaintiffs' attorney attempted to

elicit the fact that Dr. Jergens was named as a defendant in a

separate lawsuit that plaintiffs brought arising from the same set

of facts. Plaintiffs' attorney was attempting to show that Dr.

Jergens' testimony should not be viewed as impartial, because

plaintiff was also attempting to impose liability on Dr. Jergens in

the separate lawsuit. "Extrinsic evidence offered to establish bias

*** [by] the witness may be admitted following denial by the

witness of a fact giving rise to such an inference when put to the

witness on cross-examination." M. Graham, Cleary & Graham's

Handbook of Illinois Evidence §607.2, at 340 (5th ed. 1990).

     Even more confusing than the majority's misapplication of the

collateral matter rule is the suggestion that the conduct of the

plaintiffs' attorney that occurred outside the presence of the jury

requires reversal of the jury verdict. The "mini trial" described

in the majority opinion in which plaintiffs' attorney made many of

the heated accusations of perjury and the quoted remarks

questioning the integrity of defense counsel occurred outside the

presence of the jury. As this occurred outside the presence of the

jury, I fail to understand how any of this has any relevance to

whether the defendant hospital received a fair trial.

     The majority finds that the trial judge abused his discretion

in making the statement to the jury concerning the existence of the

pending lawsuit against Dr. Jergens. In that statement, the judge

told the jurors that in considering Dr. Jergens' credibility, they

may consider that he was aware of a lawsuit against him and that

the defendant's attorneys had done "certain things that encouraged

the doctor to believe his answer was accurate." The majority finds

"no sound basis for these charges."

     I question the overly charitable view the majority gives the

defense in this matter as well as the import of the instruction on

which the majority finds error. After denying his awareness that he

was a "defendant" in the companion lawsuit, Dr. Jergens ran from

the courtroom in an effort to evade service of process. Plaintiffs'

attorney believed this conduct showed an awareness of the suit, and

a hearing was held outside the presence of the jury. At the

hearing, the court attempted to determine if the witness had been

coached to give a misleading answer. The defense attorney initially

denied ever talking about the lawsuit with Dr. Jergens:

               "MR. SANDBERG [defense attorney]: Since the time the

          lawsuit was filed, I have never talked to Dr. Jergens

          about the lawsuit and there is no evidence otherwise--."

     The majority finds that defendant's attorney merely "misspoke"

in denying that he had ever discussed the lawsuit with Dr. Jergens.

However, the defendant's attorney did not completely "correct

himself" until Dr. Jergens was returned to the courtroom to

directly contradict this statement. After Dr. Jergens was located,

he testified that he had discussed the lawsuit with both defense

attorneys at a meeting at the hospital and immediately before

testifying in court. It was based on this discussion, as well as

discussion with other attorneys, that Dr. Jergens formed his belief

that he was not actually a party until served.

               "MR. COOK [plaintiffs' attorney]: Who gave you that

          understanding? Did you talk about that with Ms. Hines or

          Mr. Sandberg?

               DR. JERGENS: Among others.

               MR. COOK: Among others. When's the last time that

          you talked with them about that fact before you

          testified? Yesterday?

               DR. JERGENS: We talked about a suit yesterday. But

          whether or not the last time they talked to me about

          being summoned?

                                    ***

               MR. COOK: Doctor, again, you were told yesterday

          that you're not a defendant until you're served with

          summons by one or both of these lawyers, is that right?

               DR. JERGENS: That's my recollection.

               MR. COOK: That's yesterday. Where were you when you

          had that discussion with one or both of those lawyers?

               DR. JERGENS: I was at Memorial Hospital.

               MR. COOK: Who else was present?

               DR. JERGENS: No one.

                                    ***

               MR. SANDBERG: Did I tell you because you hadn't been

          served you're not a defendant in the companion case?

               DR. JERGENS: That was my understanding from our

          conversation and from the conversations I had with other

          lawyers."

Upon further questioning by defendant's attorney, Dr. Jergens

clarified his response by stating that the specific question

regarding his party status was not discussed with the defense

attorneys prior to his testimony.

     Based on this hearing, the trial court determined that defense

counsel "had done certain things that encouraged the doctor to

believe that his answer was accurate." This characterization is

supported by Dr. Jergens' testimony at the hearing and is a neutral

explanation of why the doctor testified that he believed he was not

a party. This explanation directly impugns neither the integrity of

defense counsel nor Dr. Jergens. In addition, the court stated that

the jury may consider the fact that Dr. Jergens is a defendant in

a lawsuit filed by the plaintiffs in determining his credibility.

Thus, the trial court's instruction placed the evidence of Dr.

Jergens' bias in a proper context for the jury and explained the

error of his testimony in a neutral fashion. I would not find that

the trial court abused its discretion in this regard.

     The majority also finds error in certain comments plaintiffs'

attorney made during closing arguments. Specifically, the majority

complains that plaintiffs' attorney suggested that nurses were

encouraged to "modify their testimony" and objects to the

comparison of the defense attorneys to nefarious attorneys who

violated ethical rules. I note that attorneys are granted wide

latitude in closing arguments. Furthermore, even the majority is

forced to acknowledge that, in light of the evidence presented,

there is support for these charges. More importantly, defense

counsel did not object to plaintiffs' closing arguments. I do not

agree that these comments, which were grounded in the evidence

presented and not objected to at trial, constitute a sound basis

for a new trial. For these reasons, I respectfully dissent from the

majority's opinion.

     JUSTICE HARRISON joins in this dissent.